STATE OF CONNECTICUT *v.* ROBERT L. WALKER
(AC 23974)

Foti, Bishop and McLachlan, Js.

Argued October 14—officially released December 16, 2003

*Glenn W. Falk*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Timothy J. Liston*, state's attorney, and *Russell C. Zentner*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Robert L. Walker, appeals from the judgments of conviction, following a jury trial, of two counts of aggravated sexual assault in the first degree in violation of General Statutes § 53a-70a (a) (1), four counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), two counts of kidnapping in the first degree with a firearm in violation of General Statutes § 53a-92a, four counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), threatening in violation of General Statutes § 53a-62 (a) (2), criminal possession of a weapon in violation of General Statutes § 53a-217, two counts of credit card theft in violation of General Statutes § 53a-128c (a), three counts of fraudulent use of an automatic teller machine in violation of General

Statutes § 53a-127b, two counts of illegal use of a credit card in violation of General Statutes § 53a-128d and one count of larceny in the sixth degree in violation of General Statutes § 53a-125b. The defendant fled the state prior to the completion of trial. He was sentenced by the trial court in absentia to a total effective term of fifty years incarceration, suspended after thirty-two years, with twenty years probation.[1] On appeal, the defendant asserts that the court improperly denied his motion for a mistrial, claiming that events that transpired during the trial prejudiced the jury. We affirm the judgments of the trial court.

The facts relating to the defendant's claim are as follows. Following the state's case-in-chief, the trial judge informed the parties that one of the jurors, L,[2] had informed the courtroom clerk that she had received, in the mail, an anonymous letter and a news article concerning the defendant.[3] The trial judge thereafter

---

[1] The defendant was later apprehended in Canada and returned to this state, where, in a separate proceeding, he pleaded guilty to two counts of failure to appear in the first degree and one count of failure to appear in the second degree. He remains incarcerated.

[2] Any reference to individual jurors will be made by use of their initials so as to protect their legitimate privacy interests. See, e.g., State v. Reynolds, 264 Conn. 1, 116 n.109, 836 A.2d 224 (2003).

[3] The court marked the letter, the news article and the envelope in which they were mailed as court exhibits. The letter stated, in its entirety:

"Responsible Citizen

"Please don't let that Convicted Rapist go free!

"She could have been someone you loved.

"Friends of Victims"

The news article, dated March 9, 2000, was in the form of a single page printout from an Internet web site. The article, entitled "Civic Organization's Leader Is Registered As A Sex Offender," was not in its entirety. The article stated as follows:

"The president of the Greater Hartford Jaycees resigned Wednesday, less than two weeks after registering with state police as a convicted sex offender.

"Robert L. Walker, a 31-year-old Bloomfield resident, assumed the Jaycees' top job Jan. 1, taking control of a community service organization best known for running the Canon Greater Hartford Open golf tournament.

"His criminal history came to light Feb. 24 when, after he was contacted by state police, he registered as a sex offender and his picture was placed

called L into the courtroom outside of the presence of the other jurors and questioned her about what she had received. L stated that she had read the letter, but that she did not read any part of the news article, opting instead to let her husband review it because she did not know if it contained "a threat." She stated, however, that her husband informed her that the article did not include any threatening material and that she asked her husband to refrain from relating any other information about the article to her.

The trial judge asked L whether the letter would influence her ability to serve as a juror. L responded that it would not. The prosecutor asked L whether she had any doubt that she "could still decide the case for both sides fairly and impartially." L responded: "Definitely. I mean, it could have come from anybody. For all I know, it could have come from you, it could have come from the defendant's attorney. It could have come from family members. I don't know."

The defendant's attorney also questioned L. The following colloquy occurred:

on the registry's Web site. Court records show Walker was convicted of first-degree robbery and third-degree sexual assault in 1991. Police say that in 1989, he assaulted and robbed a flight attendant at a Windsor Locks hotel after pretending to be a hotel employee.

"On Wednesday, Walker said he was stepping down from the unpaid Jaycees post because of 'personal matters and health reasons.'

"His resignation comes as Middletown police say they are investigating an incident that occurred late last week involving Walker. The case was handed over to the unit that investigates crimes against people, which is seeking an arrest warrant in that case, police said.

"Walker, who has not been charged in that incident, declined to discuss the matter, citing 'legal reasons.'

"But, he said, 'I have nothing to hide.'

"The chairman of the Jaycees' board, Michael J. Davis, said he knew Walker had been in prison but he did not know he was a sex offender.

" 'It had never crossed my mind to wonder what he had done.' Davis said. 'We are not an organization that judges people. We take people at face value.'

"It was clear, however, that Walker was a dedicated Jaycee, a gifted public . . . ."

"[Defense Counsel]: The sentence, 'Don't let that confirmed rapist go free,' doesn't have any effect?

"[The Witness]: Not to my knowledge that he is a confirmed rapist, so.

"[Defense Counsel]: So, as far as you are concerned, this was just a crank letter that you cross off as a crank letter?

"[The Witness]: Exactly.

"[Defense Counsel]: Which may or may not be accurate?

"[The Witness]: Exactly, because I don't even know any facts about his previous history. I'm just here to decide the facts that are given to me.

"[Defense Counsel]: Did you discuss these letters— Did any of you discuss these letters on your way in this morning or after you got together this morning?

"[The Witness]: The jurors asked who got a letter. That was it. Some—

"[Defense Counsel]: Sorry?

"[The Witness]: We all had obviously a letter. We noticed some did, some did not. So, we asked, 'Did everybody get a letter?' We did not discuss the contents.

"[Defense Counsel]: Did anybody have any speculation about as to where the letter came from or who the letter came from?

"[The Witness]: No."

After the court and the attorneys questioned L, the court instructed her to put the items mailed to her aside and not to let them influence her in deciding the case. The court brought each juror, outside the presence of their fellow jurors, into the courtroom and, along with

the attorneys, questioned each juror concerning the anonymous letters.

Juror M similarly stated that she had received a mailing containing a letter and a news article. M stated that she had read part of the news article before handing it to her husband. M represented that she did not believe that she could be "completely objective" in deciding the case and expressed her concerns that she might experience "ramifications" were she to vote one way or another in the case. M further represented that she did not think she would be able to put the information aside and decide the case on the basis of the evidence presented at trial.

Another juror, E, stated that she also received the same letter and news article. She recounted that she read only the first line of the letter, which stated, "dear concerned citizen," and that she then handed it to her husband, who instructed her not to read it and to show it to the court. E further stated that the jurors had acknowledged that certain of them had received letters, but that the jurors had not discussed the contents of the letters. E stated that the letter would not affect her jury service and her ability to follow the court's instructions.

The defendant's counsel questioned E and the following colloquy transpired:

"[Defense Counsel]: Did it frighten you at all to be receiving a letter about this case?

"[The Witness]: I don't think I would say frightened.

"[Defense Counsel]: Concern? Concern you?

"[The Witness]: Yes, concerning.

"[Defense Counsel]: Do you have any speculation— don't tell me what they are. Do you have any speculation or guesses about—

"[The Witness]: I'm trying not to even think about it because I just don't want to go there.

"[Defense Counsel]: And you can be as fair as you should be to my client and to the state?

"[The Witness]: I will try my hardest to do that.

"[Defense Counsel]: Do you have any reservations about it?

"[The Witness]: No. I will try my best to do what I feel is right, and that's usually what I do. I try to do my best.

"[Defense Counsel]: Okay. What you feel is right based on the evidence that is presented in this court-room, not on evidence that is sent to you in the mail anonymously?

"[The Witness]: Yes."

The court next questioned juror T, who stated that the letter and news article had been mailed to his home, as well. He stated that his wife had opened the envelope containing the items and showed him the letter, which he read. The court asked T if he recalled the contents of the letter. T responded: "Here's what I recall. 'Don't let this rapist go free. Your duty,' something like that, 'friends of the victim.' " T further represented that after his wife told him that there was an article about the case, he told her not to read it to him, to put it back in the envelope and that he would bring it to the court's attention. The court asked T whether he could decide the case on the basis of the evidence he hears in court and not let the items mailed to him affect his verdict. T responded affirmatively. The court asked T if he had "any question" about his ability to disregard the items mailed to him. T responded that he did not.

Defense counsel then questioned T, and the following colloquy occurred:

"[Defense Counsel]: 'Don't let that rapist go free.' That doesn't have any affect on you?

"[The Witness]: It struck me as being either from someone very dumb or someone dumber, trying to act dumb. The letter. I don't understand where it came— I don't know what that letter is all about.

"[Defense Counsel]: Did it bother you to have a letter come to your house about this case?

"[The Witness]: Well, I know that when we did the voir dire—when we went through voir dire, I thought when we gave names and addresses. So, I figured that's how it came to my house.

"[Defense Counsel]: Names and towns, but—

"[The Witness]: Pardon.

"[Defense Counsel]: Names and towns. This is not going to have any affect on how you view this case or how you view the testimony, or what you think about things in this courtroom that are said?

"[The Witness]: That letter?

"[Defense Counsel]: Yes.

"[The Witness]: No. I mean obviously someone is saying he's a rapist, he's saying he isn't. Why—

"[Defense Counsel]: I'm asking you. If you're saying it doesn't, it doesn't have any affect on how you listen to the testimony, on how you view what the state says and how you view what I say, and what evidence there is, if you're saying that's the case then—

"[The Witness]: I don't think it will affect what the state says or what you say. So, to have an open mind, some idiot sent me a letter trying to say to do a certain thing."

The court also questioned jurors W, D, J and G, all of whom stated that they had not received the letter or the news article.[4] All four of those jurors represented that, although they were aware that some of their fellow jurors had received something about the case in the mail, the jurors who had received the letter and the news article had not discussed the content of what they had received with them.[5] All four of those jurors also represented that the fact that some of their fellow jurors had received the letter and the news article in no way affected their ability to remain fair and impartial or to

---

[4] The court instructed the jurors to be cautious about what they might receive in the mail about the case and, if at all possible, to have someone else screen their mail. The very next day following the court's examination of the jury, juror W reported to the court that he, too, had received in his mail the letter and the news article about the case. W delivered the items to the court. The court called W into the courtroom, outside of the presence of his fellow jurors, and W represented that his wife had examined the items and told him that a letter had come in the mail that "would probably pertain to the case." The court asked W if he had read the contents of what he had received. W responded that he had not. The court instructed W to ignore the fact that he had received the letter. The court asked W if he had "any difficulty at all" in continuing to serve as a juror in the case. W responded that he did not.

The defendant immediately renewed his motion for a mistrial. The court denied the motion, noting that W did not read the materials and did not know their contents. The court found credible W's representation that the fact that he had received a letter, which he did not examine at all, would not affect his ability to remain a fair and impartial juror.

[5] When defense counsel questioned J about the fact that jurors had received the letter and the news article in the mail, the following colloquy occurred:

"[Defense Counsel]: Did anyone, even though they didn't go into the content, the ones that said they read it partially, did they talk about the general character of the article?

"[The Witness]: They refused to offer any opinion. They were very tight lipped. Nobody wants to see a mistrial. And they were very good about it.

"[Defense Counsel]: Why is it that no one wanted to see a mistrial?

"[The Witness]: We have given up a lot personally to come here every day, and we don't want to see the state incur expense, the defendant incur additional expense, ourselves. It's once you start the process, and you're committed to do it, you want to see it end. It's like running a marathon. The last 100 yards you didn't want to stop. That's what it feels like."

hear the evidence adduced at trial and to return a verdict solely on the basis of such evidence.

After the court and the attorneys interviewed the jurors, the defendant moved for a mistrial. Defense counsel argued that the information sent to the jurors concerned the defendant's prior criminal history and that it was, therefore, "extremely prejudicial." Defense counsel also argued that it was impossible to predict how that form of jury tampering might affect the jury and that the problem implicated the defendant's right to receive a fair trial.

The court orally denied the defendant's motion for a mistrial. The court first noted that it was not predisposed to deny the defendant's motion simply because the parties and the court already had expended considerable time and resources on the case. Instead, the court based its ruling on the jurors' responses to the questions asked of them. The court assessed the representations made by the jurors as being "quite frank." The court further determined that the jurors realized their civic duty, devoted time in hearing the evidence and were motivated to avoid discussing the matter.

The court noted that W,[6] D, J and G, the four jurors who had not received the material in the mail, consistently represented that they were aware only that some of their fellow jurors had received some type of correspondence and that no juror had discussed the contents of what he or she had received. Insofar as those four jurors were concerned, the court determined that it was "beyond [its] comprehension" how the improper communication with some of the jurors could affect them.

The court next discussed its findings with regard to M. The court noted that M was the only juror who had

---

[6] At the time that the court rendered its decision, W had not yet received the mailing. See footnote 4.

read at least part of the news article concerning the defendant's prior criminal history. The court determined that this fact, as well as M's representation that she would have "a hard time" disregarding the information that she read, warranted M's removal from the jury.

The court noted that L had represented that she read only the letter and not the news article. The court stated that it had concern over the phrase "convicted rapist" in the letter, but that its concerns were allayed by L's representation that she would disregard what she had read and that it would have no affect on her. The court concluded: "Taking her at her word, I have instructed her, and I assume she will follow those instructions."

The court stated its findings with regard to E as follows: "[E] indicated that all she read was basically, 'dear concerned citizen,' which it doesn't say. It says, 'Responsible Citizen.' But that's her recollection. That's all she read. She never even read further where it indicates that the defendant supposedly was a convicted rapist. "So, she did not read the rest of that document or any of the second document, and it would not affect her at all. And I don't see how it could." Likewise, the court noted that T had read only the letter and not the news article. The court observed that T did not even recall the fact that the term "convicted rapist" was used in the letter. The court was satisfied that T, as he had indicated, could disregard what he had read.

The court summarized its conclusions with regard to all of the jurors, except M, as follows: "None of these jurors read the second page, which is the Hartford Courant article itself. I am totally satisfied that the little bit they read on that first page, they can put that aside, they can be totally fair and impartial, and [they] said it would not affect them on this case at all. I am extremely satisfied that the jurors were candid. I think they did not share any of that information. And I would be more

concerned if they read that second page, which one juror did, which appears [to be] an article from the Courant. The three remaining jurors who received correspondence indicated [that] they did not read the second page. No one in the household told them anything about that. I'm totally satisfied that they will be fair and impartial, that the little bit that they did read will not affect them sitting on the case."[7]

Having set forth the necessary facts, we now set forth the standard of review that controls our consideration of the defendant's claim that the court improperly denied his motion for a mistrial. "While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Higgins*, 265 Conn. 35, 75–76, 826 A.2d 1126 (2003).

---

[7] The court had excused another juror for unrelated medical reasons and excused juror M for the reasons previously discussed. The courtroom clerk chose replacement jurors from the pool of alternate jurors, drawing by lot. Jurors L, E, W, D, J and G reached the verdict that underlies this appeal. As is customary, the court excused alternate juror T from the jury's deliberations after it delivered its jury charge.

Our appellate review is constrained to evaluating the court's exercise of its discretion even when, as here, the issue concerns whether improper communications between members of the jury and a person who is not a member of the jury deprived the defendant of his right to a fair trial. "Although we recognize that trial [c]ourts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias . . . we nevertheless have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred." (Citation omitted; internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 297, 750 A.2d 1059 (2000).

The constitution of Connecticut, article first, § 8, and the sixth amendment to the United States constitution guarantee a defendant's fundamental right to a fair trial by an *impartial* jury. "So basic to our jurisprudence is the right to a fair trial that it has been called 'the most fundamental of all freedoms.' *Estes* v. *Texas*, 381 U.S. 532, 540, [85 S. Ct. 1628, 14 L. Ed. 2d 543] (1965). It is a right essential to the preservation and enjoyment of all other rights, providing a necessary means of safeguarding personal liberties against government oppression." *Nebraska Press Assn.* v. *Stuart*, 427 U.S. 539, 586, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976) (Brennan, J., concurring). "[T]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson* v. *Colorado*, 205 U.S. 454, 462, 27 S. Ct. 556, 51 L. Ed. 879 (1907). It has long been the law of this state that any communication between a juror and any person not a member of the jury, concerning the cause under consideration, is prohibited. See *Bennett* v. *Howard*, 3 Day (Conn.) 219, 223 (1808).

Before reaching the merits of the defendant's claim, we first address an issue raised by the defendant con-

cerning whether he or the state bore the burden of proof. The defendant correctly points out that the letter mailed to the jurors attempted to persuade the jurors to convict him of the crimes with which he stood charged and that the news article that accompanied the letter referred to his prior criminal history. He argues that those communications were presumptively prejudicial and that the state bore the burden of demonstrating their harmlessness. The state, in contrast, argues that when, as here, the court itself was in no way responsible for the impropriety, the defendant bears the burden of demonstrating that he actually was prejudiced by the improper communication.

Our Supreme Court discussed the burden of proof in cases involving improper juror contact in *State* v. *Rhodes*, 248 Conn. 39, 726 A.2d 513 (1999). The defendant in *Rhodes*, having been convicted of murder and felony murder, filed a motion for a new trial on the ground of juror misconduct. Id., 42. The defendant alleged that a juror had discussed the deliberations with a third party. Id. The trial court conducted an evidentiary hearing in which the juror at issue admitted that she had engaged in several conversations about aspects of the case in general, and the course of the jury's deliberations, with her boyfriend. Id., 42–45. The trial court in *Rhodes* determined that "irrespective of which party bore the burden of proof on the issue of prejudice, and by whatever standard of proof, the defendant could not prevail on his claim" and, thus, denied the defendant's motion for a new trial. Id., 45.

On appeal, the defendant in *Rhodes*, as does the defendant in the present case, argued that the improper contacts between the juror and the third party were presumptively prejudicial and that the state bore the burden of establishing that the contacts were harmless. Our Supreme Court stated that this state's prior case law "places the burden on the defendant to show that he

or she was actually prejudiced by the juror misconduct when the trial court is in no way responsible for the impropriety." Id., 48. The Supreme Court determined that the circumstances of the case presented "no reason to revisit [its] prior case law regarding the burden or standard of proof in juror misconduct cases" because the defendant could not prevail either under the established standard in this state or under the standard proposed by the defendant. Id., 50. The court nevertheless acknowledged that a split of authority existed in the United States Circuit Courts of Appeal "as to whether a presumption of prejudice arises when a juror has improper communications about the case with a third party." Id., 49 n.16.

Our Supreme Court in *Rhodes*, however, referring to *United States* v. *Olano*, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993), signaled that the "critical consideration in resolving a claim of improper juror contact is not whether prejudice may be assumed from such contact, but, rather, whether, under the specific facts of the case, any such impropriety actually affected the verdict." *State* v. *Rhodes*, supra, 248 Conn. 49 n.16. The court cited *Olano*, in which the United States Supreme Court stated: "There may be cases where [a jury] intrusion should be presumed prejudicial . . . but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's [deliberations] and thereby its verdict?" (Internal quotation marks omitted.) Id., 50 n.16, quoting *United States* v. *Olano*, supra, 739.

Our Supreme Court in *Rhodes* applied the legal principles that apply with equal force to the present claim: "[N]ot every incident of juror misconduct requires a new trial. . . . [D]ue process seeks to assure a defendant a fair trial, not a perfect one. . . . [T]he constitution does not require a new trial every time a juror has been placed in a potentially compromising situation

. . . [because] it is virtually impossible to shield jurors from every contact or influence which might theoretically affect their vote. . . . The question is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. . . . The defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror. . . . We have previously held that, in cases where the trial court is directly implicated in juror misconduct, the state bears the burden of proving that misconduct was harmless error. . . . Where, however, the trial court was in no way responsible for the juror misconduct . . . we have repeatedly held that a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Rhodes,* supra, 248 Conn. 47.[8]

Applying those well settled legal principles to the present case, we conclude that the court did not abuse

---

[8] This court is not at liberty to disregard or to reevaluate the decisions of our Supreme Court, for we are bound by those decisions. *State* v. *Colon,* 71 Conn. App. 217, 245–46, 800 A.2d 1268, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002). In numerous cases released after *Rhodes,* both our Supreme Court and this court have continued to require defendants seeking a new trial on the basis of improper juror contact to prove that the misconduct occurred and that it resulted in *actual prejudice.* See, e.g., *State* v. *Dorans,* 261 Conn. 730, 752, 806 A.2d 1033 (2002); *State* v. *Feliciano,* 256 Conn. 429, 449, 778 A.2d 812 (2001); *State* v. *Respass,* 256 Conn. 164, 191, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001); *State* v. *Anderson,* 255 Conn. 425, 446, 773 A.2d 287 (2001); *State* v. *Booth,* 250 Conn. 611, 649, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut,* 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000); *State* v. *Wilson F.,* 77 Conn. App. 405, 424, 823 A.2d 406, cert. denied, 265 Conn. 905, 831 A.2d 254 (2003); *State* v. *Jackson,* 73 Conn. App. 338, 356, 808 A.2d 388, cert. denied, 262 Conn. 929, 814 A.2d 381 (2002); *State* v. *Sunderland,* 65 Conn. App. 584, 591, 782 A.2d 1269 (2001); *State* v. *Jones,* 60 Conn. App. 866, 872–73, 761 A.2d 789 (2000), cert. denied, 255 Conn. 942, 769 A.2d 59 (2001); *State* v. *Portee,* 55 Conn. App. 544, 566, 740 A.2d 868 (1999), cert. denied, 252 Conn. 920, 744 A.2d 439 (2000).

its discretion in finding that the defendant failed to meet his burden of proving that the misconduct, which he proved occurred, resulted in *actual prejudice*. Upon learning that L and some of her fellow jurors had received information about the case, the court afforded the unusual situation the concern and attention that it warranted. As was its duty, the court conducted an appropriate inquiry to investigate the allegation that a juror or jurors may have become biased. See *State* v. *Roman*, 262 Conn. 718, 727, 817 A.2d 100 (2003). The record reflects that the court questioned each juror, and invited and permitted counsel for each side to question each juror, which they did.

The court made numerous factual findings in support of its conclusion that the attempt to prejudice the jury did not warrant a mistrial. The court's function with regard to the matter required it to assess prejudice. On the basis of the representations of each juror, the court had to determine whether "the misbehavior [was] such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror. . . . Because it is in the best position to evaluate the assurances by the jurors, the trial court's credibility assessment is entitled to substantial weight." (Citation omitted; internal quotation marks omitted.) *State* v. *Feliciano*, 256 Conn. 429, 450, 778 A.2d 812 (2001). The court's analysis in this case was inherently fact specific. When findings are not clearly erroneous, this court will decline to substitute its judgment for that of the finder of fact.

The court's findings, that the improper mailings had prejudiced M and that the other jurors had not been prejudiced, find support in the record. The court based its findings largely on the jurors' representations about what they *actually read*. As the court noted, jurors W, D, J and G did not even review either the letter or the news article, and they did not learn any of the details

about either of those items from their fellow jurors. Of the other three jurors who received the improper items, L, E and T, none of them read the news article. L read the brief letter, which contained the phrase "convicted rapist." The court found, however, that L credibly represented that the letter would have no affect on her and that she could follow the court's instructions. E recalled only that she read the greeting, "dear concerned citizen," in the letter, and the court found credible her representation that this would not affect her ability to remain impartial as a juror. Finally, T represented that he had read the letter, but that he did not even recall that the term "convicted rapist" was used in the letter. Again, the court specifically found that T could disregard what he had read.

The court's factual findings with regard to all of those jurors are clear. Acting within the scope of its fact-finding role, the court was "extremely satisfied" that the jurors were candid, that they had not discussed the contents of the letter or the article, that they could put aside whatever effect the improper mailing had on them, and that they could remain "totally fair and impartial." It is fortunate that the court became aware of the incident immediately after it occurred and prior to the jury's deliberations. That timing permitted the court to examine each juror, to receive face-to-face assurances from each juror that the incident would play no role in their deliberations and specifically to instruct the jurors that they were to disregard completely what recently had been mailed to some of them.[9]

---

[9] The defendant argues, in what he deems a separate issue, that "a mistrial should have been declared on account of the jurors' suspicion that the defendant or his counsel had tampered with the jury and had access to their personal information." In support of his claim, the defendant refers specifically to the responses of jurors L and E that, he presumably argues, evidenced their belief that the defendant or his counsel had mailed the information to the jurors. Our review of the record reveals otherwise.

When the prosecutor questioned L about whether she could "still decide the case fairly and impartially" despite having received the letter and the news article, L responded: "Definitely. I mean, it could have come from

This court does not make light of the potentially negative impact that the letter and the news article might have had on every member of the jury. That can be no better demonstrated than by the representations of M, whom the court properly excluded. Our concerns, however, are allayed by the court's findings that none of the jurors who remained on the panel had read the news article and that the three jurors who had read some or all of the letter were unaffected. The record supports the court's determination that those jurors would remain fair and impartial, and that, as they had demonstrated, they would follow the court's instructions and not permit the information mailed to some of the jurors to affect their verdict. The court's findings were not clearly erroneous, and its underlying findings support its conclusion that the defendant failed to demonstrate that he suffered actual prejudice. Consequently, we conclude that the court's denial of the defendant's motion for a mistrial reflected a sound exercise of its discretion.

The judgments are affirmed.

In this opinion the other judges concurred.

---

anybody. For all I know, it could have come from you, it could have come from the defendant's attorney. It could have come from family members. I don't know."

E represented that she was concerned, although not frightened, by the fact that she had received a letter about the case. When defense counsel asked her whether she had any speculation about where the letter came from, E responded: "I'm trying not to even think about it because I just don't want to go there."

The defendant did not raise his claim precisely before the trial court. He did, however, argue that it was prejudicial to him that "the jurors feel that someone is tampering with them . . . and we have no idea who." The court did not determine that this was the case and, on the basis of the record before us, nothing in the responses of those two jurors, or of any of the other jurors, reflects a belief that either the defendant or his counsel had mailed the letters. We will not presume that such prejudice existed. Accordingly, we conclude that this aspect of the defendant's claim lacks merit.