STATE OF CONNECTICUT *v.* RANDAL LICARI
(AC 28735)

Flynn, C. J., and Robinson and Stoughton, Js.

634

Argued March 10—officially released July 14, 2009

*Raymond L. Durelli*, special public defender, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Howard S. Stein*, assistant state's attorney, for the appellee (state).

*Opinion*

STOUGHTON, J. The defendant, Randal Licari, appeals from the judgment of conviction, rendered after a jury trial, of arson in the first degree in violation of General Statutes § 53a-111 (a) (3),[1] larceny in the first degree in violation of General Statutes §§ 53a-122 (a)

---

[1] General Statutes § 53a-111 (a) provides in relevant part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building . . . he starts a fire or causes an explosion, and . . . (3) such fire or explosion was caused for the purpose of collecting insurance proceeds for the resultant loss . . . ."

(2) and 53a-119,[2] insurance fraud in violation of General
Statutes § 53a-215 (a) (1),[3] and conspiracy to commit
larceny in the first degree and insurance fraud in viola-
tion of General Statutes §§ 53a-48,[4] 53a-122 (a) (2), 53a-
119 and 53a-215.[5] The defendant claims: (1) the trial
court abused its discretion when it admitted evidence of
uncharged misconduct for the purpose of establishing a
common scheme, intent and absence of accident or to
corroborate other evidence; (2) the court abused its
discretion in admitting the written statement of the
defendant's former wife as substantive evidence under
the rule of *State* v. *Whelan*, 200 Conn. 743, 753, 513
A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L.

---

[2] General Statutes § 53a-122 (a) provides in relevant part: "A person is
guilty of larceny in the first degree when he commits larceny, as defined
in section 53a-119, and . . . (2) the value of the property or service exceeds
ten thousand dollars . . . ."

General Statutes § 53a-119 provides in relevant part: "A person commits
larceny when, with intent to deprive another of property or to appropriate
the same to himself or a third person, he wrongfully takes, obtains or
withholds such property from an owner. . . ."

[3] See footnote 5.

[4] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy
when, with intent that conduct constituting a crime be performed, he agrees
with one or more persons to engage in or cause the performance of such
conduct, and any one of them commits an overt act in pursuance of such con-
spiracy."

[5] General Statutes § 53a-215 (a) provides in relevant part: "A person is
guilty of insurance fraud when the person, with the intent to injure, defraud
or deceive any insurance company: (1) Presents or causes to be presented
to any insurance company, any written or oral statement including computer-
generated documents as part of, or in support of, any application for any
policy of insurance or a claim for payment or other benefit pursuant to
such policy of insurance, knowing that such statement contains any false,
incomplete, or misleading information concerning any fact or thing material
to such application or claim; or (2) assists, abets, solicits, or conspires with
another to prepare or make any written or oral statement that is intended
to be presented to any insurance company in connection with, or in support
of, any application for any policy of insurance or any claim for payment
of other benefit pursuant to such policy of insurance, knowing that such
statement contains any false, incomplete, or misleading information concern-
ing any fact or thing material to such application or claim for the purposes
of defrauding such insurance company."

Ed. 2d 598 (1986), where the purported written state-
ment was not sufficiently reliable for admission under
the rule; (3) the defendant's conviction of both larceny
and insurance fraud violated the double jeopardy clause
of the federal constitution; and (4) the defendant was
deprived of a fair trial by the prosecutor's pretrial con-
duct. We affirm the judgment of the trial court.

The jury reasonably could have found the following
facts. On December 15, 2002, the defendant, an
employee for the city of New York department of envi-
ronmental protection (department), left his home
around 2 p.m. for a 3:30 p.m. shift at the Croton Lake
Gatehouse.[6] In the early morning of December 16, 2002,
the defendant received notice, while still at work, that
his house, located at 1330 Huntington Turnpike in Trum-
bull, had been severely damaged by fire. The defendant
first called the Trumbull police and fire departments
to see if they knew whether his wife and daughter were
safe. Once he learned that his wife and daughter were
safe, he received permission to leave work and drove
to the fire scene, arriving at approximately 2:30 a.m.

Three detectives from the state fire marshal's office
of the Connecticut state police, Roger Baxter, Edgar
Rodriguez and John Kananowicz, investigated the fire.
Baxter was the electrical consultant, Rodriguez was the
case officer and Kananowicz was responsible for the
site sketch included in the final report prepared by
Rodriguez. Baxter investigated the fire and determined
that the origin of the fire was in the corner of the
downstairs living area near a stack of Duraflame logs
located next to a Christmas tree. He observed that an
electrical cord from the Christmas tree lights ran across
the top of the stack of Duraflame logs and into an
electrical outlet located directly above the Duraflame
logs but determined that neither the electrical cord nor

---

[6] The Croton Lake Gatehouse is approximately a one hour car ride from
the defendant's home in Trumbull.

the electrical outlet was the cause of the fire. Baxter did not observe any other potential sources of the fire and concluded that the fire was of an "undetermined" origin. A report prepared by Rodriguez determined that the fire appeared "to be accidental in nature and more probably than not caused by the Christmas tree," but the report indicated that this determination was not absolute and that the investigation could be opened in the future if additional information was obtained.

The defendant hired John Cotter, Jr., of Nutmeg Adjusters Incorporated, a licensed Connecticut public adjuster, to represent him in his insurance claim. Cotter estimated the replacement cost of the house to be $230,000, and the defendant's insurance company, The Standard Fire Insurance Company, estimated the replacement cost of the house to be $254,500, depreciated to $190,900. On the basis of this information, both Cotter and the insurance company agreed that the full amount of the homeowner's insurance policy, $181,000, should be paid.[7] After receiving full payment from his insurance company in February, 2003, the defendant began construction on a new house at 1330 Huntington Turnpike. During the time of the construction, the defendant and his family rented a house from his mother, which was located in Patterson, New York.

In addition to his employment with the department, the defendant owned a limousine chauffeur business (business). The primary customers of the business were

---

[7] The $181,000 limit only applied to the dwelling structure. As Cotter explained, additional coverage was available under the defendant's insurance policy for such things as debris removal, other appurtenant structures (e.g., a garage), replacement cost of personal property and living expenses incurred while a new residence was secured. Under the defendant's insurance policy, debris removal was covered up to $6300, other appurtenant structures were insured up to $18,100, personal property was insured up to $126,700 and living expenses were covered up to $36,200; therefore, an additional $187,300 was available to the defendant. The defendant submitted claims and received moneys under these additional policy limits.

people needing rides to and from area airports. In April, 2002, the defendant filed for bankruptcy protection pursuant to chapter 7 of the United States Bankruptcy Code as a result of a significant decrease in persons traveling due to the events of September 11, 2001. Although the defendant was granted a discharge in bankruptcy pursuant to 11 U.S.C. § 727, some of his debts relating to the business were not discharged.[8] To pay for his business debts, which totaled more than $80,000; see footnote 8; the defendant refinanced his house, taking out an additional mortgage. At the time of the fire in December, 2002, the defendant had three mortgages on his house. The defendant had been an active gambler since the 1970s and had "financial problems all the time," thus requiring him to work more than one job.

Heather Licari, the defendant's daughter from his first marriage, also worked at the department. She had gotten the job through the help of her father and grandfather. In late 2001, Heather Licari moved in with the defendant and his second wife, Angela Licari, in an effort to combat her addiction to prescription drugs. The defendant placed some restrictions on her while she was living at his house. For example, Heather Licari's boyfriend was not allowed over, and she was not allowed to bring or to use drugs in the defendant's house. About one or two months before the fire, the defendant asked Heather Licari to leave his house after finding her boyfriend and drug supplier, Frank,[9] in his house.

Near Thanksgiving of 2002, the defendant asked Heather Licari to rent a storage unit. The defendant

---

[8] The business debts that were not discharged included a $28,000 to $32,000 car loan for a limousine, which was co-signed by the defendant's wife, Angela Licari, and a $53,000 Small Business Administration loan, which was secured by the defendant's house.

[9] The record does not disclose Frank's last name.

told Heather Licari that he was having financial problems and was going to burn down his house. Although Heather Licari did not rent the storage unit, she helped the defendant transport items to the unit, which the defendant rented on December 12, 2002. On the night of the fire, the defendant called Heather Licari sometime between 11 p.m. and 1 a.m. and told her that he was on his way back to work and that he had started the fire. He then called her a second time and told her that as he was getting out of the shower in the locker room at work, he was notified of the fire. Edward Olsen, the defendant's co-worker, received a call from the defendant's brother regarding the fire and went to find the defendant to notify him of it. Olsen found the defendant as the defendant was leaving the locker room. Olsen testified that he did not know whether the defendant was at the gatehouse the entire night.

Heather Licari went to the defendant's house after the fire on December 16, 2002, and walked through it with the defendant. When they were in the living room, the defendant told her that that was the location where he had started the fire, explaining that he had placed Duraflame logs under the Christmas tree. Moreover, as they were walking through the house, the defendant was laughing at the fire investigators calling them "stupid . . . because he thought he got away with [setting the fire]."

In January, 2003, Heather Licari entered a drug detoxification program, which required her to miss several weeks of work. Because she failed to inform the department that she would be missing work, she lost her job at the department. She then moved in with her new boyfriend, Olivier Vanecci, in Vermont. In December, 2003, the Vermont residence in which Heather Licari was living was burglarized. One of the items taken in the burglary was a laptop computer that the defendant had stolen from the department. The defendant was

unable to use the computer because he did not know the password. Heather Licari, however, had a friend who was able to identify the password, and, because she was able to use the stolen computer, she kept it.

In December, 2004, Heather Licari received a telephone call from the New York state police informing her that they had the items taken in the burglary. When she went to retrieve the items, she spoke with two investigators affiliated with the department. The investigators told her that they had spoken with the defendant and that he told them that she had stolen the laptop. She then told the investigators about the defendant's burning down his house. She also told them that the defendant had caused a fire that destroyed her automobile in Milford in the summer of 2001 so that she could recover the insurance proceeds and pay off her automobile loan. The investigators relayed this information to Detective Anthony Recupero of the Trumbull police department. On the basis of this information, Recupero began a second investigation of the house fire. As part of his investigation, Recupero received and executed a search and seizure warrant for the defendant's new house at 1330 Huntington Turnpike on February 14, 2005. During his search, Recupero seized numerous items that the defendant indicated were lost in the fire in the claims submitted to his insurance company.[10] Recupero also interviewed Heather Licari and, in April, 2005, received a sworn written statement from her, detailing the defendant's involvement in the house fire. In May, 2005, Recupero applied for and was granted an arrest warrant for the defendant.

The defendant's trial began on October 3, 2006. At the close of the state's case-in-chief, the defendant made

---

[10] Such items, to name a few, included old bankbooks, financial documents, pictures, wedding cards, magazines, a 35 millimeter Canon camera and a Heritage antique telephone.

an oral motion for a judgment of acquittal on all counts, which the court denied. The jury returned a verdict of guilty as to all counts. Thereafter, on December 15, 2006, the defendant filed a motion for a new trial and a second motion for a judgment of acquittal. The court denied both motions after a hearing and rendered judgment accordingly. This appeal followed. Additional facts will be set forth as necessary.

## I

The defendant first claims that the court improperly admitted testimony that he had set fire to Heather Licari's automobile in order that she might collect insurance money. The court admitted this testimony under § 4-5 (b) of the Connecticut Code of Evidence,[11] and the defendant claims that the court's ruling constituted harmful error. We disagree.

"We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Beavers*, 290 Conn. 386, 396, 963 A.2d 956 (2009).

The defendant contends that the court abused its discretion in admitting the evidence for the purposes of establishing a common scheme, intent and absence of accident or corroboration of other evidence. He claims that the challenged evidence fails to meet the

---

[11] Section 4-5 (b) of the Connecticut Code of Evidence provides in relevant part: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent . . . common plan or scheme, absence of mistake or accident, knowledge [or] a system of criminal activity . . . or to corroborate crucial prosecution tesimony." Subsection (a) provides: "Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person."

requisite standards for admissibility for any of the purposes for which it was admitted. The state contends that the evidence was relevant on the issue of intent, as to whether the fire was accidentally caused, and to show a common scheme.

The defendant filed a motion in limine requesting that the court preclude the state from introducing any evidence relating to any fire or fires that had occurred in or to a motor vehicle either owned or driven by the defendant. In an offer of proof, the prosecutor informed the court that Heather Licari would testify that the defendant told her that she was foolish to be making car payments on her automobile, an Audi A4, and said that they would get rid of it so that she would not have to make payments anymore. He told his daughter that he was going to start a fire in the car and make it look like an electrical fire so that she could collect the insurance and pay off the automobile loan. The defendant drove the automobile, on August 8, 2001, to the Amateur Jai Alai Fronton in Milford, where he had a second job, and, at about 10:45 p.m., the Milford fire department responded to a fire in Heather Licari's Audi A4. The defendant told the fire department investigators that he had come out and found the automobile smoking and burning inside. An investigation showed that an electrical fire that appeared accidental had occurred underneath the dashboard. The automobile was a total loss; an insurance claim was paid, and the automobile loan paid off.

The state claimed that this misconduct evidence was admissible for several different reasons under § 4-5 (b). The defendant claimed that he had not benefited from the automobile fire, as he did not receive any of the insurance proceeds, that he never had been charged with any crime in connection with it and that the probative value of this evidence was outweighed by the resulting prejudice to him. The court determined that

the relevant rule of evidence was § 4-5 (b) under which evidence of other crimes, wrongs and acts is admissible to prove, among other things, intent, motive, common plan or scheme, absence of mistake or accident, knowledge or a system of criminal activity. The court decided that the evidence was relevant, that it went to show a common plan or scheme but was not the sort of thing that was going to shock the jury and that its probative value was not outweighed by the danger of unfair prejudice. Thereafter, the court instructed the jury that the evidence was not offered to prove the defendant's bad character or tendency to commit criminal acts but was offered solely to show or to establish "a method or plan or scheme . . . in the commission of criminal acts or the existence of intent or the absence of accident."

It is well established that evidence of prior misconduct is generally inadmissible to prove that a defendant is guilty of the crime charged. *State* v. *Beavers*, supra, 290 Conn. 399. On the other hand, evidence of crimes so connected as to tend directly to prove the commission of the charged crime is admissible. Id. For such evidence to be admissible, it must first be relevant to one of the exceptions set forth in § 4-5 (b), and, second, its probative value must outweigh its prejudicial effect. Id., 400. "[T]he trial court's decision will be reversed only whe[n] an abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) Id.

We agree with the defendant that evidence of the automobile fire was not admissible to show a common scheme or plan. That fire occurred some sixteen months before the house fire. There was no evidence indicating that the two fires were part of a single, overall plan conceived by the defendant to burn both his daughter's car and his house. Although there was evidence that

each fire was set to obtain insurance proceeds, there was no evidence that there was a plan to obtain insurance money by burning insured properties. See *State* v. *Randolph,* 284 Conn. 328, 339–46, 933 A.2d 1158 (2007).

The evidence was admissible, however, to prove the closely related issues of intent, which the state was required to prove, and lack of accident or mistake. See *State* v. *Beavers,* supra, 290 Conn. 400–401. The evidence that the defendant started a fire in the automobile in order that his daughter might recover insurance proceeds tended to prove that he knew how to start a fire that appeared to be accidental in nature and that he intentionally set fire to his residence to recover insurance proceeds. The defendant testified that he had absolutely nothing to do with the house fire. In addition, no evidence that the house fire had been set was found by the fire investigator and the fire investigation report stated that the fire appeared to be accidental. On the other hand, Heather Licari testified that the defendant told her that he had started the fire. Thus, whether the house fire had been set or was caused accidentally was at issue. The defendant's success in destroying his daughter's automobile in what appeared to be an accidental fire so that she might recover the insurance proceeds makes utterly limpid his subsequent intent to burn down his house in what appeared to be an accidental fire to recover the insurance proceeds.

We agree with the court that this evidence was not such as to shock the sensibilities of the jury and that its probative value exceeded its prejudicial effect. We conclude, therefore, that the court did not abuse its discretion in admitting the evidence of the automobile fire.

II

The defendant next claims that the court improperly admitted the written statement of his former wife for

substantive purposes under *State* v. *Whelan*, supra, 200 Conn. 743, because that statement was not sufficiently reliable. We disagree.

In *Whelan*, our Supreme Court adopted a hearsay exception allowing the substantive use of prior written, inconsistent statements signed by a declarant who has personal knowledge of the facts stated when he testifies at trial and is subject to cross-examination. Id., 753. Section 8-5 (1) of the Connecticut Code of Evidence codifies this rule and incorporates subsequent developments and clarifications.[12] See *State* v. *Simpson*, 286 Conn. 634, 642, 945 A.2d 449 (2008). The exception applies to a relatively narrow category of prior inconsistent statements and is carefully limited to those prior statements that carry such substantial indicia of reliability as to warrant their substantive admissibility. Id. As with all other admissible nonhearsay evidence, we allow the fact finder to determine the credibility of the hearsay statement upon consideration of all the relevant circumstances. Id., 643. "[A] prior inconsistent statement that fulfills the *Whelan* requirements may have been made under circumstances so unduly coercive or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of the witness." *State* v. *Mukhtaar*, 253 Conn. 280, 306, 750 A.2d 1059 (2000). In such circumstances, the court must act as a gatekeeper to ensure that the statement does not go to the jury for substantive purposes if it is persuaded that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process. Id.

---

[12] Section 8-5 of the Connecticut Code of Evidence states in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial: (1) . . . A prior inconsistent statement of a witness, provided (A) the statement is in writing . . . (B) the writing . . . is duly authenticated as that of the witness, and (C) the witness has personal knowledge of the contents of the statement."

The following additional facts are relevant to the defendant's claim. Barbara Grascia had once been married to the defendant and was the mother of Heather Licari. Grascia testified for the defendant and told the jury that Heather Licari was angry at her father. Grascia testified that the day after Heather Licari gave her statement to the police, Heather Licari told her that the statement was not true and that she was angry and on drugs when she gave the statement. During the trial, but before her testimony, Grascia went to the Trumbull police department and gave a statement to Recupero. In the statement, she explained that she was afraid of the defendant, that he had threatened harm to their daughter, to her and to others in retribution for what was happening to him, and said that she did not want to testify. During his cross-examination of Grascia, the prosecutor offered the statement pursuant to § 8-5 (1).

During her cross-examination, Grascia testified that she had provided the information contained in the nine page, handwritten statement, that she had signed each page of the statement and that each page included a certification that the facts contained therein were true. Grascia testified that she did not want to go to the police department and was advised by her attorney not to do so. She then offered several reasons for having gone to the police department and given the statement. Some of the reasons were that her present husband made her do it; someone from the prosecutor's office called her brother-in-law, who worked for the district attorney in Westchester, New York, to put pressure on her husband; she was scared; everyone around her was telling her that she would be arrested; and that the prosecutor had tricked her and lied to her. Moreover, she testified that her former father-in-law said that the prosecutor had threatened to arrest every member of the family until he could get to the defendant. On redirect, Grascia admitted that she was not threatened by police while she was at the police department.

When the statement was offered, the defendant conceded that it was a prior inconsistent statement in writing signed by the witness who had personal knowledge of its contents and was available for cross-examination. Although it met the requirements of § 8-5 (1), the defendant objected on the ground that the statement had nothing to do with the charges. When asked if there were any other objections, the defendant replied that there were none. Neither then, nor at any other time, did the defendant make the claim that he makes on appeal; that is, that the circumstances under which the statement was taken were so coercive as to make the statement unreliable.

The defendant acknowledges that this claim was not raised at trial, but he claims that Grascia's testimony was sufficient to raise the issue of unreliability. He argues that under the circumstances, it would be redundant and a mere formality to specify unreliability as a ground for objection and that the court ought to have conducted a hearing such as suggested in *State* v. *Mukhtaar*, supra, 253 Conn. 307 n.27. We agree with the state that this claim is unreviewable because the defendant failed to object to the admission of the Grascia statement on this ground. To preserve an evidentiary ruling for review, trial counsel "must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . [This] serve[s] to alert the trial court to potential error while there is still time for the court to act." (Internal quotation marks omitted.) *State* v. *Simpson*, supra, 286 Conn. 645. "[L]imiting appellate review of evidentiary claims to the ground asserted at trial applies with equal force to *Whelan* issues." Id., 646. Accordingly, we decline to review the defendant's claim.

The defendant has also requested review under the plain error doctrine. See Practice Book § 60-5. "[T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . [A] defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Simpson*, supra, 286 Conn. 647–48 n.16.

The defendant bases this claim on his assertion that the court should have conducted a *Mukhtaar* type hearing on the reliability of Grascia's statements. Grascia testified to a number of circumstances, which she offered as reasons for her false statement to the police. She also testified, however, that she had signed each page of her nine page, handwritten statement and that each page included her certification that the facts contained therein were true. Moreover, she admitted that she was not threatened by police when she gave her statement. The court, therefore, properly left the credibility of Grascia's testimony to the jury. We find no error at all, much less plain error, which results in manifest injustice, in the failure of the court, sua sponte, to conduct such a hearing.

## III

Next, the defendant claims that his conviction of both larceny in the first degree and insurance fraud violated his federal constitutional guarantee against double jeopardy. Although he failed to raise this claim in the trial court, we grant review under the now familiar holding of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[13]

It is well established that the double jeopardy clause of the United States constitution is applicable to the states. *State* v. *Re*, 111 Conn. App. 466, 468, 959 A.2d 1044 (2008), cert. denied, 290 Conn. 908, 964 A.2d 543 (2009). "Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense." (Internal quotation marks omitted.) Id., 469. The second prong requires application of the test set forth in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932); that is, whether each offense as charged requires proof of a fact which the other does not. *State* v. *Re*, supra, 469.

The double jeopardy clause bars cumulative punishment for nominally distinct offenses arising out of the same act or transaction only if the two offenses are substantially the same, requiring therefore a determination as to whether each count requires proof of an additional fact that the other does not. *State* v. *Alvarez*,

<hr/>

[13] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

257 Conn. 782, 789, 778 A.2d 938 (2001). It is undisputed that both the larceny charge and the insurance fraud charge arise out of the same act or transaction—the obtaining of the fire insurance proceeds from The Standard Fire Insurance Company after the defendant's house was destroyed by fire. The larceny in the first degree count in the information requires the state to prove that the defendant committed larceny in the amount in excess of $10,000, but it did not require any proof as to the method or manner of the obtaining of the currency. See footnote 2. The insurance fraud count required the state to prove that the defendant, with intent to injure, defraud or deceive an insurance company, presented or caused to be presented in support of a claim for payment statements he knew contained false, incomplete or misleading information concerning material facts. See footnote 5. Thus, it is apparent that each count required proof of a fact or facts that the other did not.

The defendant claims that insurance fraud in the circumstances of this case is a lesser offense included within larceny. "[I]f two offenses stand in the relationship of greater and lesser included offense, [however] then [t]he greater offense is . . . by definition the same for purposes of double jeopardy as any lesser offense included in it." (Internal quotation marks omitted.) *State* v. *Peloso*, 109 Conn. App. 477, 510, 952 A.2d 825 (2008). If it is possible to commit the greater offense in the manner described in the information without having first committed the lesser offense, then the lesser is not an included offense. See *State* v. *Sanseverino*, 291 Conn. 574, 590 n.12, 969 A.2d 710 (2009). Because the commission of the larceny charged did not require presentation of false, incomplete or misleading statements in support of a fraudulent claim for payment, the charge of insurance fraud was not a lesser offense

included within the larceny charge. Thus, the defendant's claim fails.

## IV

Finally, the defendant claims that the prosecutor committed improprieties during pretrial, which deprived him of a fair trial. More specifically, the defendant claims that the prosecutor used his position to fabricate evidence and to control those who did and did not testify for the defense. We disagree.

Because this claim was not raised at trial, the defendant seeks to prevail under *State* v. *Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004). In *Stevenson*, our Supreme Court clarified that in cases involving prosecutorial impropriety, "it is unnecessary for the defendant to seek to prevail under the specific requirements of *State* v. *Golding*, [supra, 213 Conn. 233], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)."[14] *State* v. *Stevenson*, supra, 572–73.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine

---

[14] In *Williams*, our Supreme Court stated: "In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540.

whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[T]he touchstone of due process analysis in cases of alleged [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007).

During trial, four witnesses, William Unden,[15] Randi Licari,[16] Grascia and the defendant, claimed to have been threatened with arrest for failing to cooperate with authorities. Both Unden and Randi Licari testified outside the presence of the jury. Unden testified that Officer Mike Carroll, a department investigator, and another officer[17] threatened to arrest him because he "wasn't telling them what they wanted to hear" and that they wanted him to lie. Randi Licari testified that her grandparents, the defendant's mother and father, complained to her about being threatened by Carroll and another officer[18] from New York. Even if true, there is no claim that the prosecutor made or was in any way

---

[15] Unden is an employee of the department and worked with the defendant at the Croton Lake Gatehouse.

[16] Randi Licari is the youngest daughter of Grascia and the defendant.

[17] The officer's name was not provided in the record.

[18] The officer's name was not provided in the record.

involved in the making of any such alleged threats. These claims, therefore, do not constitute evidence of prosecutorial impropriety. Moreover, it is unclear how such threats, even if made, precluded the defendant from presenting a defense. Randi Licari did not state that she was directly threatened, only that her grandparents were. Further, there was no evidence that either Randi Licari or Unden altered his testimony as a result of the alleged threats.

The defendant next asserts that the prosecutor "coerced Grascia into providing [her] statement with the sole intent of using the statement as a tool with which to discredit Grascia's in-court testimony."[19] We conclude that the defendant is merely reasserting his unpreserved evidentiary claim "through the guise of a claim of prosecutorial impropriety with constitutional implications." *State* v. *Burgos-Torres*, 114 Conn. App. 112, 121, 968 A.2d 476 (2009); see *State* v. *Cromety*, 102 Conn. App. 425, 431, 925 A.2d 1133 ("[a]lthough our Supreme Court has held that unpreserved claims of prosecutorial impropriety are to be reviewed under the *Williams* factors, that rule does not pertain to mere evidentiary claims masquerading as constitutional violations"), cert. denied, 284 Conn. 912, 931 A.2d 932 (2007). We therefore decline to review this unpreserved evidentiary claim.

Finally, the defendant asserts that his mother did not testify because she was threatened with arrest by the prosecutor. Grascia testified that the defendant's father told her that the prosecutor had threatened to arrest every member of the family until he could get to the defendant. The defendant claims that the prosecutor relied heavily on the rent receipts to prove that the defendant was guilty of larceny and insurance fraud;

---

[19] See discussion in part II.

therefore, his mother's testimony was necessary to discredit the state's theory that the defendant never paid rent to her while he was rebuilding his home. Our review of the record reveals that there was myriad evidence presented by the state to prove that the defendant was guilty of larceny and insurance fraud. Although Grascia testified that the defendant's parents told her that they were threatened by the prosecutor, the defendant did not call his mother, father or any other family member who was allegedly threatened to the witness stand to testify. Thus, there was no direct evidence that they were threatened or that they were prevented or discouraged from testifying. We therefore conclude that the defendant has not established that he was denied his right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.