STATE OF CONNECTICUT *v.* CHANDRA BOZELKO
(AC 29549)

Beach, Alvord and Peters, Js.

Argued September 25, 2009—officially released February 23, 2010

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom were *Paul O. Gaetano*, supervisory assistant state's attorney, and, on the brief, *Kevin D. Lawlor*, state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Chandra Bozelko, appeals from the judgments of conviction, rendered after a jury trial in four files on fourteen counts. In docket number CR-05-128445, the defendant was convicted of attempt

to commit larceny in the first degree in violation of General Statutes §§ 53a-122 and 53a-49; identity theft in the first degree in violation of General Statutes § 53a-129b; attempt to commit illegal use of a credit card in violation of General Statutes §§ 53a-128d and 53a-49; and forgery in the third degree in violation of General Statutes § 53a-140. In docket number CR-05-128811, the defendant was convicted of larceny in the third degree in violation of General Statutes § 53a-124; identity theft in the third degree in violation of General Statutes § 53a-129d; illegal use of a credit card in violation of § 53a-128d; and forgery in the third degree in violation of § 53a-140. In docket number CR-05-129108, the defendant was convicted of attempt to commit larceny in the fifth degree in violation of General Statutes §§ 53a-125a and 53a-49; attempt to commit illegal use of a credit card in violation of § 53a-128d and 53a-49; and identity theft in the third degree in violation of § 53a-129d. In docket number CR-05-129107, the defendant was convicted of larceny in the fifth degree in violation of § 53a-125a; illegal use of a credit card in violation of § 53a-128d; and identity theft in the third degree in violation of § 53a-129d. The jury found the defendant not guilty on eight other counts.[1] On appeal, the defendant asserts that the court improperly (1) denied her motion for a mistrial, claiming that events that transpired during the trial prejudiced the jury, (2) denied her motion to proceed pro se and (3) instructed the jury about reaching

[1] In docket number CR-01-129104, the defendant was found not guilty of attempt to commit larceny in the fourth degree in violation of General Statutes §§ 53a-125 and 53a-49; attempt to commit illegal use of a credit card in violation of §§ 53a-128d and 53a-49; larceny in the sixth degree in violation of General Statutes § 53a-125b; illegal use of a credit card in violation of § 53a-128d; and identity theft in the third degree in violation of § 53a-129d. In docket number CR-05-129102, the jury found the defendant not guilty of attempt to commit larceny in the fourth degree in violation of §§ 53a-125 and 53a-49; attempt to commit illegal use of a credit card in violation of §§ 53a-128d and 53a-49; and identity theft in the third degree in violation of § 53a-129d.

a unanimous verdict. Additionally, the defendant claims that her convictions of both identity theft and illegal use of a credit card violate her constitutional right to be free of double jeopardy. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. The defendant was employed by Kate's Paperie, a paper products and gift store, between November 5, 2003, and January 24, 2004. Kate's Paperie accepted major credit cards, and store employees had access to the signed credit card receipts, which included the customer's name and full credit card account number.

In December, 2003, Pamela Williams purchased items from Kate's Paperie in Greenwich. She paid for these items by using her American Express credit card. Shortly thereafter, Williams examined her American Express monthly statement and discovered that approximately $3000 had been charged to her card by a Greenwich boutique without her knowledge or authorization. American Express investigated the charges and determined that the charges were fraudulent. Williams' credit card was deactivated and a new card using a new account number was issued to her. Using this new card, Williams made other purchases from Kate's Paperie. In March, 2005, several purchases were charged to Williams' new American Express account without her knowledge or authorization. These purchases were made online from Blissout, Inc., Amazon.com, Inc., Sephora USA, Inc., and The Finish Line, Inc.

On January 20, 2005, Paul Gerst, a Federal Express employee, attempted to deliver two packages to 133 Wild Rose Drive in Orange. The packages required the addressee to sign a receipt indicating that she had received them in order for Gerst to leave them. The homeowner at 133 Wild Rose Drive was not home, so Gerst did not leave the packages. As Gerst was getting

back into his truck, the defendant came out of a neighboring house. This house was numbered 183 Wild Rose Drive. The defendant informed Gerst that the packages were misaddressed. She told him that they should have gone to her home at 183 Wild Rose Drive, not 133 Wild Rose Drive. The defendant then signed for the packages using the name "S. Bosis."

Prior to January, 2006, John Hillgen lived at 133 Wild Rose Drive. On several occasions, packages that did not belong to him were delivered to his home. Each time Hillgen informed the sender that they had misaddressed the packages and then returned them to the sender.

Gerst was assigned to deliver another package to 183 Wild Rose Drive on March 17, 2005. This package was addressed to Pamela Williams. Williams did not reside at 183 Wild Rose Drive. Gerst was instructed by his supervisor to deliver the package to the town of Orange police department as part of an ongoing investigation. Robert Cole, a town of Orange police investigator, called the telephone number listed on the package and discovered that it belonged to the defendant.

Five days later, Gerst was assigned another parcel to be delivered to 189 Wild Rose Drive. When Gerst delivered the package to the resident of 189 Wild Rose Drive, she informed him that the package did not belong to her but, rather, belonged to 183 Wild Rose Drive, the house next door. This package was addressed to the defendant.

In December, 2004, Jonathan Boies and his wife, Jodie Boies, were joint users of an American Express account. On December 23 or 24, 2004, Jodie Boies used her American Express credit card at Kate's Paperie. On January 27, 2005, Randy Vines, a fraud investigator from Nieman Marcus, the parent company of Bergdorf Goodman, telephoned Jonathan Boies regarding possible fraudulent purchases, in the amount of $2252, charged

to his American Express credit card and shipped to 133 Wild Rose Drive in Orange. The Boies' American Express account was used again at the end of January, 2005, to purchase approximately $43,000 worth of merchandise from Bergdorf Goodman. The customer who ordered these purchases requested that the items be mailed to Debra Boies at 133 Wild Rose Drive in Orange, and used the defendant's telephone number. Jonathan Boies did not have any knowledge of these purchases, did not know of any Debra Boies and did not authorize anyone to use his credit card.

The United States Postal Service and town of Orange police officers conducted a videotaped controlled delivery to the defendant, in which Patrick Bernardo, a United States postal inspector, purported to deliver merchandise from Bergdorf Goodman to 183 Wild Rose Drive, the address of the defendant. Bernardo asked the defendant: "[A]re you Debra Boies?" The defendant responded that she was and proceeded to sign "Debra Boies" on four different sections of the United States postal parcel slips. The defendant was then taken into custody.

I

We first turn to the defendant's argument that the court erred in denying her motion for a mistrial on the basis of jury partiality. We disagree.

The additional facts relating to the defendant's claim are as follows. On October 4, 2007, the presentation of evidence ended. The following morning, the court was informed that at least three jurors had received telephone calls regarding the case at home on the previous evening. The court instructed those three jurors to leave the room and inquired of the remaining three regular jurors and two alternate jurors whether they had received telephone calls as well. One additional juror indicated that he received a telephone call as well. The

court then proceeded to summon and to inquire of the four affected jurors individually.

Juror R[2] testified that at about 8:06 p.m. he received a telephone call from a young male asking whether he was a juror. R responded by asking: "Who wants to know? What's going on? What do you mean? I can't talk about it." The caller repeated several times, "[t]he girl is innocent." He also stated, "[y]ou're sending the wrong person to jail." The juror responded to the caller, "I'm not supposed to be talking [about] this to you," and asked, "[h]ow did you get my number?" The caller stated that he couldn't tell R how he got his number but that he "had friends in the court system." R also asked how the caller knew that the defendant was not guilty. The caller answered that he "stayed over to check the records" and that "[h]er boss lied." The caller also pleaded with R, "[d]on't put her in jail, she's innocent . . . her boss lied." R's caller identification system showed the telephone call came from Kate's Paperie.[3]

The court then inquired as to R's ability to be impartial after receiving this telephone call. R stated that the telephone call did not influence his ability to sit as a fair juror and that he would follow the court's instructions to decide the case solely based on the evidence presented to the court.

[2] Any reference to individual jurors will be made by use of their initials so as to protect their legitimate privacy interests. See, e.g., *State* v. *Reynolds*, 264 Conn. 1, 116 n.109, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

[3] It is clear from the context of R's conversation with the caller that R was not attempting to discuss further the merits of the caller's assertions that the defendant was not guilty. Rather, R was trying to gather information to assist the court in investigating the caller's identity, and he insisted to the caller that he could not discuss the merits of the case. Cf. *State* v. *Andrews*, 29 Conn. 100, 104 (1860) (juror participated in conversation with another person in jury pool about defendant's attempted commission of similar offense in another jurisdiction). The court in this case could have construed R's inquiry into the caller's basis for his information to be an effort to discover more about the caller's identity.

Juror D similarly testified that someone had called her home at 8:04 p.m. the previous night. D's caller identification system indicated that the telephone call was from Kate's Paperie. D's mother answered the telephone and said, "what juror?" This prompted D to pick up the telephone. D asked the male voice who he was, and he responded, "she did not work here." D replied by saying, "I don't need to talk to you," and disconnected the call. D testified that she informed the marshal about the call when she arrived at the courthouse and that she had not discussed the matter with anyone else. D stated that the call would not influence her and that she could still be a fair juror.

Juror W informed the court that he received a telephone call at about 8:15 p.m. the previous evening. W's wife answered the call, and the male caller asked if she was on the jury. W's wife responded that she was not on the jury, and the caller asked who was on the jury. W overheard this conversation and picked up another telephone to listen in on the telephone call. W's wife asked how the caller had found their number, to which he responded that he had gotten the number from the court. She then told the caller, "[n]obody's on a . . . jury here" and disconnected the telephone. The court questioned W as to whether the telephone call would affect his ability to be a fair and impartial juror. W stated that he could remain impartial and fair and that his deliberations would not be affected by extraneous information.

Juror K stated that she received a telephone call at 8:18 p.m. the previous evening. A male caller asked her: "Are you on the jury?" K then hung up the telephone. The court questioned K as to whether she could remain fair and impartial. K stated that she could and that she had not been compromised or affected by what had happened the previous night.

The defendant first moved that D, one of the female jurors, be removed. The court had asked each juror if he or she had discussed the telephone calls with any other juror. Juror D stated that she had not spoken of this matter with anyone. Jurors W and K, however, stated that while sequestered by the court prior to being questioned about the telephone calls, one of the female jurors remarked to the other three jurors, "oh, you got a call, too." Both W and K stated that nothing else was discussed regarding the calls. The court found that "in weighing their reaction, [it felt] fairly comfortable that this would be a harmless error," as "[t]hey did not discuss the nature of the calls."

The defendant then moved for a mistrial, arguing that she could not be given a fair trial. The court denied the defendant's motion for a mistrial on the ground that the jurors had stated that they would remain fair and impartial. The court concluded that each juror had taken an oath to remain fair and impartial and that it firmly believed that the jurors would abide by their oath.

We turn to the standard of review that controls our consideration of the defendant's claim that the court erred in denying her motion for a mistrial. "In [its] review of the denial of a motion for mistrial, [our Supreme Court has] recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 435, 773 A.2d 287 (2001).

Despite each juror's personal assurances to the court that he or she could remain impartial, the defendant argues that any direct contact between a juror and a third party creates a presumption of partiality. The

defendant further argues that the state has the burden of proving that it was harmless beyond a reasonable doubt for the court not to have excused the jurors who had been contacted at home. Finally, the defendant argues that jurors R, D and W should have been dismissed for juror misconduct because they did not immediately disconnect the telephone call but, rather, engaged the caller or listened to further discourse with the caller. We are not persuaded.

"Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . [T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . Consideration [by the jury] of extrinsic evidence is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury." (Internal quotation marks omitted.) *State* v. *Abraham*, 84 Conn. App. 551, 555–56, 854 A.2d 89, cert. denied, 271 Conn. 938, 861 A.2d 514 (2004).

"[N]ot every incident of juror misconduct requires a new trial. . . . [D]ue process seeks to assure a defendant of a fair trial, not a perfect one. . . . [T]he constitution does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence which might theoretically affect their vote. . . . The question is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. . . . The defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was

influenced by it so as to render him or her an unfair and prejudicial juror. . . . We have previously held that, in cases where the trial court is directly implicated in juror misconduct, the state bears the burden of proving that misconduct was harmless error. . . . Where, however, the trial court was in no way responsible for the juror misconduct . . . we have repeatedly held that a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct." (Internal quotation marks omitted.) *State* v. *Walker*, 80 Conn. App. 542, 556–57, 835 A.2d 1058 (2003), cert. denied, 268 Conn. 902, 845 A.2d 406 (2004).[4]

Applying those well settled legal principles to the present case, we conclude that the court did not abuse its discretion in denying the defendant's motion for a mistrial. Each juror assured the court that the telephone call to his or her residence would not affect his or her ability to remain impartial and fair. They all stated that they could follow the court's instructions that they not consider any evidence not presented before the trial court when deliberating. The court's factual findings, that the telephone calls had not prejudiced each juror, find support in the record. The court based its findings largely on the jurors' representations that the telephone calls did not affect their ability to remain impartial. The fact of the jurors' impartiality was reinforced by their finding the defendant guilty of some charges and not guilty of other charges.

The defendant asserts that because the court did not recognize that jurors R, D and W engaged in misconduct,

---

[4] On the facts of this case, the term "juror misconduct" is somewhat misleading. The extrajudicial contact was not initiated by the jurors. The claim is that several of the jurors should have terminated the communications earlier. The preferred behavior is more easily identified in hindsight than in the moment, especially in view of the jurors' being caught unaware by the telephone calls.

it could not properly determine whether the jurors could have remained fair and impartial. We do not agree. "The court's function with regard to the matter required it to assess prejudice. On the basis of the representations of each juror, the court had to determine whether the misbehavior [was] such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror. . . . Because it is in the best position to evaluate the assurances by the jurors, the trial court's credibility assessment is entitled to substantial weight. . . . The court's analysis in this case was inherently fact specific. When findings are not clearly erroneous, this court will decline to substitute its judgment for that of the finder of fact." (Citation omitted; internal quotation marks omitted.) *State* v. *Walker*, supra, 80 Conn. App. 558.

There may be cases in which a juror's affirmation of his or her ability to be fair does not overcome the inherent prejudice of a particular communication. See *Aillon* v. *State*, 173 Conn. 334, 339–40, 377 A.2d 1087 (1977) (ex parte conversations between court and juror presumptively prejudicial). This case, in which the contact was not initiated by a juror, was quite brief and, at least on the surface, favored the defendant, is not such a case. We conclude that the denial of the defendant's motion for a mistrial was not an abuse of the court's discretion.

## II

The defendant next claims that the court improperly denied her request to represent herself in violation of her rights under the sixth amendment to the federal constitution.[5] Specifically, the defendant asserts that

---

[5] Our Supreme Court "generally [has] interpreted the state and federal constitutions as providing essentially equivalent protections with respect to a defendant's right to self-representation." *State* v. *Shashaty*, 251 Conn. 768, 780, 742 A.2d 786 (1999), cert. denied, 529 U.S. 1094, 120 S. Ct. 1734, 146 L. Ed. 2d 653 (2000). Although the defendant in her brief makes reference to the right of self-representation explicitly stated in article first, § 8, of our

after the jury had been selected, but prior to the jury's being sworn, she sought to waive the right to counsel and to represent herself but that the court summarily and improperly denied her request. The defendant also maintains that the court improperly failed to conduct an inquiry into her request pursuant to Practice Book § 44-3. We conclude that the court exercised its discretion properly and consistently with our Supreme Court's subsequent decision in *State* v. *Flanagan*, 293 Conn. 406, 433, 978 A.2d 64 (2009).

The following additional facts and procedural history are necessary for our resolution of the defendant's claim. On May 12, 2005, the defendant was arraigned in this case. At a hearing to assign the case for trial, held on May 30, 2007, the defendant's counsel, Vito Castignoli, notified the court that the defendant was rejecting the state's plea offer and intended to go forward with a trial. Castignoli also advised the court that the defendant told him that she wanted to a hire a new attorney. After noting that the defendant's cases were very old, the court continued the case until June 13, 2007, and informed the defendant that if she intended to hire a new attorney, she should have her new attorney present at that hearing. On June 13, 2007, Castignoli, still appearing for the defendant, informed the court that the defendant had hired new counsel and requested that the court continue the cases again until new counsel had appeared. The court expressed its reluctance to do so in light of the fact that it had already provided the defendant with a two week period to retain new counsel and that the cases against her were "the oldest cases on the jury list almost by far." Despite its reluctance, however, the court granted the defendant additional time to provide an appearance of her new

state constitution, the defendant did not brief separately a claim under our state constitution or argue that she was entitled to greater rights thereunder. The appellate courts of this state consistently limit their review to federal constitutional claims, when the state constitutional claims are not accompa-

counsel. The defendant was given until June 21, 2007, the date set for the commencement of trial, to secure the appearance of new counsel, but she was instructed that no further continuances would be permitted.

On June 21, 2007, the defendant appeared in court with her new counsel, Angelica Papastavros. Papastavros informed the court that she had not had sufficient time to prepare for trial and asked for another continuance. The court thereafter conducted a scheduling conference with the parties in chambers to discuss rescheduling the cases for trial. The cases were again rescheduled.

On October 2, 2007, after jury selection, the cases were about to begin the evidential phase. That morning, defense counsel stated that she had received from the defendant a fax terminating her representation. Defense counsel informed the court that the defendant informed her "that she's willing—or she's prepared to go forward pro se, if need be." Defense counsel then stated that she did not believe that it was appropriate for the defendant to represent herself.

The state opposed the defendant's request to represent herself. The state reasoned that defendant's trial counsel was the third attorney to represent her in these matters and that her request to proceed pro se on the day evidence was scheduled to begin was just a tactic used to delay the trial.

The court then questioned the defendant in the following colloquy:

"The Court: . . . [J]ust so I am clear, you were represented by attorney [Robert] Casale at one point in time in this matter?

"[The Defendant]: Yes, Your Honor.

nied by a separate and sufficient analysis. *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992).

"The Court: And you were—you basically dismissed him from representing you, is that correct?

"[The Defendant]: No, that's not true, Your Honor.

"The Court: But, obviously, he's no longer representing you?

"[The Defendant]: Correct.

"The Court: And you retained attorney Vito Castignoli to represent you?

"[The Defendant]: No, I did not. Attorney Castignoli was retained by my conservator at the time.

"The Court: But, as far as an appearance, so what the court works with is an appearance of an attorney, that both attorney Casale and attorney Castignoli were representing you by appearance?

"[The Defendant]: It is correct that both attorney Casale and attorney Vito Castignoli had appearances in these files in the past.

"The Court: All right. And, now, it's my understanding you later retained attorney Papastavros.

"[The Defendant]: I retained attorney Papastavros of my own accord.

"The Court: And you, obviously, were satisfied with her representation through the jury selection process, is that correct?

"[The Defendant]: That's correct.

"The Court: That, over—if my math is correct—we had, if not over eighty potential jurors or around eighty potential jurors in the course of three days. And you were present when motions were argued last Wednesday in Derby—

"[The Defendant]: I was.

"The Court: With attorney Papastavros? Now, the representations of attorney Papastavros are that you are no longer satisfied with her representation, is that correct?

"[The Defendant]: That is correct.

"The Court: Well, I think it's within—I'm sure it's within my authority to basically reject your actions. I think I've just named . . . three of the most qualified criminal defense attorneys in the New Haven, Milford area that you, at some point in time, said you were not satisfied with and no longer wanted their services. I am concerned with the fact that we have already spent three full days and then a half day on this matter. And here it is at the commencement of a trial when we've had jurors come in—come back. The expense the state has had to absorb in getting witnesses in and putting their case together, to have you come in on the beginning of the first day of evidence in saying, I am not satisfied anymore with my attorney, I feel that this is questionable, I think, because there have been other delays in this matter. And I think the state has been more than accommodating; the court has been more than accommodating with you on these matters throughout the last few years. And it is pretty close to one of the oldest cases in the Ansonia-Milford judicial district. So, I think the interests of justice are best served by going forward with the case today. And I'm not going to allow attorney Papastavros to be released. We have to go forward. We have a jury here. The state is ready to put on evidence. And I will move the case forward today."

In a later articulation of its decision in response to an inquiry from this court, the trial court stated that its reasons for denying the defendant's motion were that (1) the defendant had not expressed a dissatisfaction with her trial counsel prior to the date evidence was

scheduled to commence, (2) the defendant had exhibited a pattern of dismissing her attorneys on the eve of trial even though her attorneys were very qualified and experienced criminal defense attorneys, (3) this matter was one of the oldest on the Milford docket and (4) the defendant was facing at least ten felony charges and numerous misdemeanor charges.

"Both the federal constitution and our state constitution afford a criminal defendant the right to [forgo] the assistance of counsel and to choose instead to represent himself or herself at trial. As a matter of federal constitutional law, the right to self-representation is premised on the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged. *Faretta* v. *California*, 422 U.S. 806, 818, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); see also *McKaskle* v. *Wiggins*, 465 U.S. 168, 174, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984); cf. *Gideon* v. *Wainwright*, 372 U.S. 335, [342] 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) ([making sixth amendment right to counsel applicable to states through due process clause of the fourteenth amendment]). The Connecticut constitution is more explicit, stating directly that [i]n all criminal prosecutions, the accused shall have a right to be heard *by himself* and by counsel . . . . Conn. Const., art I, § 8. We repeatedly have interpreted this language to establish an independent state constitutional guarantee of the right to self-representation. See *State* v. *Townsend*, 211 Conn. 215, 558 A.2d 669 (1989) . . . . *State* v. *Day*, 233 Conn. 813, 820, 661 A.2d 539 (1995). Although [w]e harbor no illusions that a defendant's decision to waive counsel and [to] proceed pro se generally will lead to anything other than disastrous consequences . . . values informing our constitutional structure teach that although [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is

the lifeblood of the law. *Illinois* v. *Allen*, [397 U.S. 337, 350, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)] (Brennan, J., concurring)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Jones*, 281 Conn. 613, 646–47, 916 A.2d 17, cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007).

A defendant's right to represent himself or herself, after a clear and unequivocal request to do so, is not unlimited.[6] In *Faretta*, the United States Supreme Court identified three grounds for denying a defendant her right to self-representation: "(1) [the defendant] makes the request in [an] untimely fashion such that granting it would disrupt the proceedings; [*Faretta* v. *California*, supra, 422 U.S.] 807; (2) the defendant engages in serious obstructionist misconduct; id., 834 n.46; and (3) the defendant has not knowingly and intelligently waived his right to counsel. Id., 835; see 2 W. LaFave & J. Israel, Criminal Procedure (1984) § 11.5 (d), pp. 47–49." (Internal quotation marks omitted.) *State* v. *Townsend*, supra, 211 Conn. 221 n.4.

In accordance with those limitations, our Supreme Court recently held that "when a defendant clearly and unequivocally has invoked his right to self-representation *after the trial has begun*, the trial court must consider: (1) the defendant's reasons for the self-representation request; (2) the quality of the defendant's counsel; and (3) the defendant's prior proclivity to substitute counsel. If, after a thorough consideration of these factors, the trial court determines, in its discretion, that the balance weighs in favor of the defendant's interest in self-representation, the court must then proceed to canvass the defendant in accordance with Practice Book § 44-3 to ensure that the defendant's choice

[6] A review of the transcript would suggest that the request perhaps was not as clear and unequivocal as required by *State* v. *Flanagan*, supra, 293 Conn. 412. Because the parties do not contest whether the request was clear and unequivocal, we will proceed as if it were a clear and unequivocal request.

to proceed pro se has been made in a knowing and intelligent fashion. If, on the other hand, the court determines, on the basis of those criteria, that the potential disruption of the proceedings already in progress outweighs the defendant's interest in self-representation, then the court should deny the defendant's request and need not engage in a § 44-3 canvass." (Emphasis added.) *State* v. *Flanagan*, supra, 293 Conn. 433.

After a trial has begun,[7] it is within the trial court's discretion to determine whether the defendant's interest in her right to represent herself outweighs the potential disruption to the trial of the case. In this case, the court's decision to proceed with existing counsel was not an abuse of discretion.

In the present case, the court did not have the benefit of our Supreme Court's subsequent decision in *Flanagan*, delineating a balancing test for evaluating a defendant's request to proceed pro se after the commencement of trial. Nonetheless, the court considered the three *Flanagan* factors to determine whether the interest in representing herself was genuine and outweighed the potential for further delay. The court's colloquy clearly demonstrates its findings that (1) the defendant's reasons for requesting to proceed pro se were "questionable," as she had not expressed any displeasure with her trial counsel prior to the date evidence was to begin, (2) her previous attorneys, including the trial counsel at issue, were "three of the most qualified criminal defense attorneys in the New Haven, Milford

---

[7] Trial commences, for this purpose, at voir dire. See *State* v. *Gethers*, 197 Conn. 369, 375–76, 497 A.2d 408 (1985) ("voir dire under Connecticut law [is] an integral part of the criminal trial and a critical stage of the proceedings" [internal quotation marks omitted]); see also *State* v. *Cole*, 8 Conn. App. 545, 551–52, 513 A.2d 752 (1986) (for purposes of Practice Book §§ 623 and 624 [now §§ 36-17 and 36-18], criminal trial begins with voir dire of prospective jurors); *State* v. *Green*, 38 Conn. App. 868, 874, 663 A.2d 1085 (1995) (with regard to defendant's right to a speedy trial, criminal trial begins with commencement of voir dire).

area," and (3) the defendant had shown a previous pattern of dismissing these qualified attorneys on the eve of trial, resulting in further delay of the trial of her case. The court then weighed these factors against the possible disruption that would occur if her request was granted. The parties had already spent three and one-half days choosing a jury. That jury was present on that day to begin hearing the case. The state had expended money to have its witnesses present, some of whom had come from different states, and the case was quite old.

The defendant suggests that no delay would have resulted from self-representation. The court, however, was not bound to believe that assertion. The court clearly believed that granting the defendant's request would result in a further delay, and the defendant did not specifically state that if she were permitted to dismiss her counsel and to represent herself, no further delay would occur.[8] In fact, her attorney stated that she did not think that it would be appropriate for the defendant to represent herself, at least without standby counsel. In light of these considerations, the court determined that "the interests of justice are best served by going forward with the case [that day]" and denied the defendant's request. Accordingly, we do not find that the court abused its discretion in denying the defendant's request to represent herself.

### III

The defendant also claims that the court improperly coerced the jury to arrive at a unanimous verdict. We disagree.

The defendant concedes that her claim was not preserved because she did not file a written request to

---

[8] The representation of counsel that the defendant "was willing—or she's prepared to go forward pro se, if need be," is not precisely the same as a representation that the defendant would proceed without any delay or disruption and that none would occur during trial. The circumstances, of course, would be different had trial not begun.

charge or take an exception to the court's instructions. See *State* v. *Fabricatore*, 281 Conn. 469, 473 n.6, 915 A.2d 872 (2007) (party may preserve for appeal claim of instructional error by submitting written request to charge or by taking exception to charge). The defendant seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). *Golding* holds that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id. "The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Internal quotation marks omitted.) *State* v. *Fabricatore*, supra, 477.

The first two prongs of *Golding* are satisfied in the present case. The record is adequate for review and the defendant's claim is of constitutional magnitude because it involves her fundamental right to have her case decided by a jury. Accordingly, we consider whether the alleged constitutional violation clearly existed and clearly deprived the defendant of a fair trial.

"A challenge to the validity of jury instructions presents a question of law over which this court has plenary review." (Internal quotation marks omitted.) *Mann* v. *Regan*, 108 Conn. App. 566, 576, 948 A.2d 1075 (2008). "It is well settled that jury instructions are to be reviewed in their entirety. . . . When the challenge to a jury

instruction is of a constitutional magnitude, the standard of review is whether it is reasonably possible that the jury [was] misled. . . . In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement . . . . Individual instructions also are not to be judged in artificial isolation . . . . Instead, [t]he test to be applied . . . is whether the charge . . . as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; internal quotation marks omitted.) *State* v. *Makee R.*, 117 Conn. App. 191, 198, 978 A.2d 549, cert. granted on other grounds, 294 Conn. 912, 983 A.2d 275 (2009).

The defendant directs our attention to the court's instruction and claims that she was denied her "fundamental constitutional rights to due process and a fair trial and a unanimous verdict free of coercion." Specifically, she argues that the court coerced the jury into reaching a verdict by improperly instructing the jury: "You must, therefore, make every reasonable effort to come to a verdict. You must listen to what the other jurors say. You must not hesitate to reconsider your own options as reasonable people. You should ultimately be able to come to an agreement upon a verdict." According to the defendant, this instruction pressured the jury into reaching an unanimous verdict and undermined the integrity of its deliberation.

Viewing the charge as a whole, we conclude that the court's instruction did not pressure the jury into reaching a unanimous verdict. The state refers to *State* v. *Peary*, 176 Conn. 170, 183 n.8, 405 A.2d 626 (1978), cert. denied, 441 U.S. 966, 99 S. Ct. 2417, 60 L. Ed. 2d 1072 (1979), in which our Supreme Court upheld a jury instruction that stated: "You must not hesitate to reconsider your own opinions. . . . As reasonable people,

you should ultimately be able to come to some agreement upon a verdict." The defendant responds that the validity of the *Peary* instruction is questionable based upon our Supreme Court's decision in *State* v. *O'Neil*, 261 Conn. 49, 64, 801 A.2d 730 (2002), in which the court modified the antideadlock instruction, known as the Chip Smith instruction, to more "appropriately [balance] the systemic interest in a unanimous verdict and the defendant's right to have each and every juror vote his or her conscience irrespective of whether such vote results in a hung jury." Id., 76. We need not discuss the effect that *O'Neil* had on *Peary*, because the court's instructions satisfied the *O'Neil* requirements. The court's instruction did balance the system's interest in a unanimous verdict with the defendant's right to have jurors vote their conscience. Although the court first stated that "[y]ou must not hesitate to reconsider your own options as reasonable people. You should ultimately be able to come to an agreement upon a verdict," it followed that instruction by stating that "it is your individual duty to make up your own mind and to decide this case upon the basis of your own individual judgment and your conscience." These instructions considered together reflect the balance required by *O'Neil*. Accordingly, we conclude that the court's instructions did not mislead the jury.

## IV

The defendant's final claim is that her convictions of the identity theft charges under §§ 53a-129b and 53a-129d and of the illegal use of a credit card charges under § 53a-128d for a single course of conduct, stemming from illegal use of the victims' credit cards, violated her protection against double jeopardy. The defendant was convicted of one count of identity theft in the first degree, in violation of § 53a-129b;[9] three

[9] Section 53a-129b provides that when one commits identity theft as defined in § 53a-129a and obtains more than $10,000, one commits a class B felony.

counts of identity theft in the third degree, in violation of § 53a-129d; two counts of attempt to commit illegal use of a credit card and two counts of illegal use of a credit card, in violation of § 53a-128d. The defendant now argues that she was punished twice, under both § 53a-129a and § 53a-128d, for a single transaction in violation of her constitutional right not to be placed in jeopardy twice. We disagree.

The defendant did not preserve her claim at trial and now seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. Because the record is adequate and because a double jeopardy claim is of constitutional magnitude; *State* v. *Chicano*, 216 Conn. 699, 704–705, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991); we review the defendant's claim. "A defendant may obtain review of a double jeopardy claim, even if it is unpreserved, if he has received two punishments for two crimes, which he claims were one crime, arising from the same transaction and prosecuted at one trial . . . . Because the claim presents an issue of law, our review is plenary." (Citations omitted.) *State* v. *Crudup*, 81 Conn. App. 248, 252, 838 A.2d 1053, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004).

"In determining whether a defendant has been placed in double jeopardy under the multiple punishments prong, we apply a two step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) *State* v. *Alvaro F.*, 291 Conn. 1, 6, 966 A.2d 712, cert. denied, 558 U.S. 882, 130 S. Ct. 200, 175 L. Ed. 2d 140 (2009). "On appeal, the defendant bears the burden of proving that the prosecutions are for the same offense in law and fact." (Internal quotation marks

omitted.) *State* v. *Ferguson,* 260 Conn. 339, 361, 796 A.2d 1118 (2002).

"The traditional approach to analyzing whether two offenses constitute the same offense was set forth in *Blockburger* v. *United States,* 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (Internal quotation marks omitted.) *State* v. *Jones,* 98 Conn. App. 695, 702–703, 911 A.2d 353 (2006), cert. denied, 281 Conn. 916, 917 A.2d 1000 (2007). It is undisputed that both the identity theft charge and the illegal use of a credit card charge arose out of the same act or transaction. The identity theft charge required the state to prove that the defendant intentionally obtained the personal identifying information of another person and used that information to obtain or attempt to obtain goods or services without the consent of the cardholder.[10] This statute punishes defined acts, in this case, the acts of obtaining the credit card number and of using that credit card number, without the cardholder's permission. Identity theft in the first degree requires that the state additionally prove that the value of the goods obtained exceeds $10,000. By contrast, the illegal use of a credit card charge requires the state to prove that the defendant, intending to defraud the issuer of the credit card or merchant providing goods and services, obtained goods or services by representing

---

[10] General Statutes § 53a-129a (a) provides that a person commits identify theft "when [a] person intentionally obtains personal identifying information of another person without the authorization of such other person and uses that information to obtain or attempt to obtain money, credit, goods, services, property or medical information in the name of such other person without the consent of such other person."

that she was the holder of the credit card without the consent of the cardholder.[11] This statute punishes the act of defrauding the merchant by representing that the defendant is the cardholder. It is apparent that each charge required proof of a fact or facts that the other did not: identity theft requires that the defendant obtain the personal identity information of another person, and illegal use of a credit card does not; and illegal use of a credit card requires that the defendant intend to defraud the issuer of the credit card or a merchant, and identity theft does not.

The defendant claims that identity theft in the circumstances of this case is a lesser offense included within the crime of illegal use of a credit card. "[I]f two offenses stand in the relationship of greater and lesser included offense, [however] then [t]he greater offense is . . . by definition the same for purposes of double jeopardy as any lesser offense included in it. . . . If it is possible to commit the greater offense in the manner described in the information without having first committed the lesser offense, then the lesser is not an included offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Licari*, 115 Conn. App. 633, 651, 974 A.2d 46, cert. denied, 293 Conn. 916, 979 A.2d 492 (2009). Because the commission of illegal use of a credit card as charged did not require the state to prove that the defendant intentionally obtained the credit card number of another person without the cardholder's consent, the charge of identity theft is not a lesser offense included within the crime of the illegal use of a credit card charge.

[11] General Statutes § 53a-128d provides in relevant part: "Any person who, with intent to defraud the issuer, a participating party, or a person providing money, goods, services or anything else of value, or any other person . . . (2) obtains money, goods, services or anything else of value by representing without the consent of the cardholder that he is the holder of a specified card or by representing that he is the holder of a card and such card has not in fact been issued [commits illegal use of a credit card] . . . ."

Thus, the defendant's final claim fails under *Golding*'s third prong.

The judgments are affirmed.

In this opinion the other judges concurred.