## STATE OF CONNECTICUT *v.*
## BRUSHAUN THOMPSON
## (AC 29306)

Lavine, Beach and Alvord, Js.

Argued January 6—officially released June 22, 2010

*Jodi Zils Gagne*, special public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Michael A. DeJoseph*, assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Brushaun Thompson, appeals from the judgment of conviction, rendered after

a jury trial, of two counts of larceny in the first degree by false pretenses in violation of General Statutes §§ 53a-122 (a) (2) and 53a-119 (2), and one count of failure to appear in the first degree in violation of General Statutes § 53a-172 (a) (1).[1] The defendant claims that the trial court (1) omitted an essential element of the crime of larceny in the first degree in its jury instruction, thereby depriving him of a fair trial, (2) violated his constitutional right to self-representation by denying his request to represent himself and (3) abused its discretion by denying his motion for a mistrial.[2] We disagree with the claims and affirm the judgment of the trial court.

The information alleged two counts of larceny in the first degree by false pretenses against the defendant. Count one alleged that "on or between September 16, 2005, and September 26, 2005, in Westport . . . [the defendant], with intent to deprive another of property or to appropriate the same to himself or a third person, [the defendant] wrongfully took or obtained such property from the owner, to wit: Coach, 155 Main Street, Westport . . . by any false token, pretense, or device, [the defendant] obtained property from Coach, with the intent to defraud Coach, and that the value of the property obtained exceeded ten thousand dollars, in violation of . . . General Statutes §§ 53a-122 (a) (2) [and] 53a-119 [2]." Count two alleged that "on or

---

[1] The defendant was found not guilty of ten counts of identity theft in the third degree in violation of General Statutes § 53a-129d and one count of identity theft in the second degree in violation of General Statutes § 53a-129c (a). The defendant received a total effective sentence of sixteen years in prison, execution suspended after fourteen years, and five years of probation.

[2] The defendant also claims that the jury's verdict finding him guilty of the charges of larceny in the first degree but not guilty of the charges of identity theft are legally inconsistent. We decline to review the claim. See State v. Arroyo, 292 Conn. 558, 586, 973 A.2d 1254 (2009) ("claims of legal inconsistency between a conviction and an acquittal are not reviewable"), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010).

between September 16, 2005, and September 26, 2005, in Newington . . . [the defendant] with intent to deprive another of property or to appropriate the same to himself or a third person, [the defendant] wrongfully took or obtained such property from the owner, to wit: Lowe's, 3270 Berlin Turnpike, Newington . . . by any false token, pretense, or device, [the defendant] obtained property from Lowe's, with the intent to defraud Lowe's, and that the value of the property obtained exceeded ten thousand dollars, in violation of . . . §§ 53a-122 (a) (2) [and] 53a-119 [2]."

Section 53a-122 (a) provides in relevant part: "A person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119, and . . . (2) the value of the property or service exceeds ten thousand dollars . . . ." Section 53a-119 (2) provides in relevant part: "A person obtains property by false pretenses when, by any false token, pretense or device, he obtains from another any property, with intent to defraud him or any other person."

The jury reasonably could have found the following facts. In September, 2005, John Spalding, owner of ABC Moving, was hired by Decorator's Warehouse in Norwalk to deliver a couch and love seat to the defendant at 557 Atlantic Street in Bridgeport. When Spalding made the delivery he met the defendant for the first time. The defendant introduced himself as a "caretaker for a doctor" who orders "a lot of stuff." The defendant inquired of Spalding as to whether he would like to start picking up deliveries for "us." The defendant explained that "we're doing construction and because at the time we'd like to do some business with you because our current delivery service isn't working out." The defendant told Spalding that he worked for "Dr. Rosenblatt" and at another time for "Mr. Murray."[3] Spalding gave

---

[3] The defendant used credit card accounts owned by Larry Rosenblatt, John Murray and others to make purchases. Each man testified that he had not authorized the defendant to use his account. Rosenblatt also testified

the defendant his business card. The defendant agreed to pay Spalding $100 for each delivery.

On September 16, 2005, Betsy Nosara Conway, assistant manager of the Coach store in Westport, received a telephone call from a man who identified himself as Larry Rosenblatt. Rosenblatt wanted to place an order for merchandise he had seen in a catalogue. He ordered a number of items totaling $2534.76[4] and charged them to an American Express account belonging to Elizabeth Pocsik, who did not make the purchase or authorize anyone else to do so. Rosenblatt told Conway that he would have a man by the name of John Spalding come to get the items. Rosenblatt represented that Spalding was a courier who often picked up things for Rosenblatt.

In the meantime, the defendant had called Spalding and asked him to make a pickup at Coach in Westport. The defendant informed Spalding that Rosenblatt was throwing a party and did not have time to buy his wife a gift, so he sent Spalding to pick it up. When Spalding arrived at Coach, some of the associates helped him put the bags of merchandise in his truck. Spalding met the defendant in the parking lot of a Waldbaum's supermarket at the corner of North and Park Avenues in Bridgeport where the defendant took possession of the merchandise and paid Spalding $100.

On September 17, 2005, Conway took another telephone call from the man who again identified himself as Rosenblatt. According to Rosenblatt, his family enjoyed the gifts, and he wanted to purchase more merchandise. These items totaled $2700.88, and Rosenblatt gave Conway a credit card number but not the one he had used

that he is not a doctor but the publisher of children's books. Murray further testified that he never had been employed in real estate, contracting or development of any kind.

[4] The following items were ordered: key chains, wallets, handbags, scarves, umbrellas and shoes.

the day before. On September 21, 2005, the same so-called Rosenblatt called Coach twice and placed two additional orders with Conway. His first purchase on that day totaled $2789.92 and was charged to an American Express account belonging to Catherine Saldinger and Pierre Saldinger. Neither one of the Saldingers had authorized the use of their account for the purchase. Minutes after making the first call, the caller, identifying himself as Rosenblatt, yet again called Coach and ordered a diamond watch worth $2117.88. To purchase the watch, Rosenblatt used an American Express account belonging to Ronald Schectman, who had not authorized the use of the account for the purchase.

From September 16 through 21, 2005, the defendant placed four orders with Coach in Westport, charged $10,203.44 to credit card accounts belonging to other persons and asked Spalding each day to pick up the merchandise at Coach and deliver it to him at the Waldbaum's parking lot in Bridgeport. Each time Spalding delivered the merchandise from Coach, the defendant paid him the agreed upon fee of $100. Among the items purchased from Coach, in this fashion, was a water buffalo billfold wallet.

From September 16 through 22, 2005, the defendant asked Spalding to make six deliveries of merchandise from Lowe's in Newington to a garage below an apartment at 557 Atlantic Street in Bridgeport. The value of the merchandise delivered that week totaled $37,558.55.[5] The defendant paid Spalding $400 for each

[5] Spalding made deliveries of Lowe's merchandise to the defendant as follows: $5089.94 on September 16, 2005; $6602 on September 18, 2005; $5678.88 on September 19, 2005; $8252.09 on September 20, 2005; $278 on September 22, 2005; and $8657.64 on September 22, 2005.

The defendant purchased a wide range of merchandise from Lowe's. For example, he purchased roofing coil nails, snow throwers, a ladder, a leveling laser, a range, a range hood, a microwave, a refrigerator, a dishwasher, a granite countertop, bathroom vanities, rakes, tarps, faucets, dryers, dryer ducts and a rug.

Lowe's delivery, including one purchase valued at $278. See footnote 5 of this opinion. The defendant obtained the merchandise by using credit card accounts belonging to, among others, Bruce Angus, John Murray, Michael Morrissey, Estelle Nisson and Susan Seath.[6] None of those persons made a purchase at Lowe's in Newington and did not authorize the defendant to do so.

Each time Spalding delivered the Lowe's merchandise to 557 Atlantic Street in Bridgeport, the defendant was waiting for him. The defendant again represented to Spalding that he was the caretaker for Rosenblatt, a contractor. According to Spalding, the defendant explained that "they were going to pick them up the next day because they didn't want them on the job site, you know, because they wanted to install them the next day. That's what he told me."[7]

On September 23, 2005, Donna Corra, manager of Coach in Westport, received a telephone call from a person complaining of an unauthorized charge on her credit card account. Corra subsequently notified the Westport police. Corra informed Conway of the call, as well. On September 26, 2006, Conway took a telephone call at Coach from someone identifying himself as attorney Gary Hertzberg, who placed a telephone order and used a credit card account number to make the purchase. When Conway processed the order, the credit

[6] The credit card accounts that the defendant used to make purchases at both Coach and Lowe's belonged to customers of Advantage Waste Services (Advantage). The individuals had provided Advantage with their credit card information so that their periodic payments for garbage removal could be charged directly to their accounts. Arena Johnson, an employee of Advantage, admitted having known the defendant for fifteen years but denied that she gave him any credit card information. Johnson, however, admitted that she was a convicted felon.

[7] When later asked again why the Lowe's merchandise was delivered to the garage at 557 Atlantic Street, Spalding testified that the defendant had said that "the contractors were going to come pick it up the next morning, deliver it to the sites because they didn't want to leave them out overnight . . . ."

card information was declined. Conway telephoned the Westport police, who went to the Coach store. When Spalding arrived at the store,[8] the police explained to him that a stolen credit card was used to place the order. Coach employees gave Spalding empty shopping bags, and Detective John Rocke accompanied Spalding in his pickup truck to the Waldbaum's parking lot in Bridgeport.

Spalding and Rocke waited in the parking lot for the defendant to arrive. When the defendant drove up next to Spalding's truck, Spalding identified him to Rocke as the man who had hired him to deliver merchandise from Coach and Lowe's. Rocke got out of the truck carrying a shopping bag filled with empty Coach boxes. The defendant got out of the vehicle that he was driving and met Rocke. Rocke asked the defendant if the packages were his, and the defendant responded affirmatively. Rocke asked the defendant if he wanted the receipt, and the defendant said, "yes." Rocke reached into the bag as if to retrieve the receipt but pulled out a weapon and arrested the defendant. There was a passenger in the defendant's vehicle, Francis Beethoven, and the defendant indicated to Rocke that Beethoven was not involved. When Rocke searched the defendant, he found a Coach water buffalo double billfold wallet similar to the one that the man who identified himself as Rosenblatt had purchased on September 17, 2005. The wallet contained $110 in currency[9] and two credit cards in the name of Tamika Creer, who resided at 557 Atlantic Street.

Following the defendant's arrest, he was released on a $25,000 bond, but he failed to report for his scheduled court date on January 11, 2006. Subsequently, a warrant

---

[8] Spalding later told police that the defendant had informed him that he was picking up merchandise for Hertzberg.

[9] The currency included a $10 bill and five $20 bills, presumably for the defendant to pay Spalding $100 for making the delivery, as they had agreed.

was issued for his arrest. The defendant was taken into custody again on February 25, 2006. Additional facts will be set out where necessary.

I

The defendant first claims that he was deprived of a fair trial because the court failed to instruct the jury that it could aggregate the value of the property that was stolen only if it determined that the theft was part of one scheme or course of conduct. More specifically, the defendant argues that because no individual charge to a credit card account was valued at more than $10,000, the jury had to aggregate the individual purchases in order to have found him guilty of larceny in the first degree as to the theft of items from Coach and from Lowe's.[10] Although we conclude that the court committed constitutional error in failing to instruct the jury that it could aggregate the value of the stolen property only if it found that the thefts were part of one scheme or course of conduct,[11] the state has demonstrated that the error was harmless beyond a reasonable doubt.

---

[10] General Statutes § 53a-121 (b) provides: "Amounts included in thefts committed pursuant to one scheme or course of conduct, whether from the same person or several persons, may be aggregated in determining the grade of the offense."

[11] The court charged the jury with respect to larceny in the first degree, in relevant part, as follows: "The first count allegedly involves the Coach store . . . in Westport . . . and the second count allegedly involves the Lowe's store . . . in Newington . . . .

"The law as to the larceny in the first degree by false pretenses is as follows: A person obtains property by false pretenses when by any false pretense he obtains from another any property with intent to defraud him or any other person. There are five elements to this crime, and I'll now go through them . . . .

"The first element is false pretense. This means that the defendant made a false representation or statement of a past or existing fact. A representation may be false either expressly or by implication and may consist of any act or word calculated and intended to deceive.

"A false pretense is an intentional false statement concerning a material matter of fact in reliance on which the title or possession of property is parted with. A misrepresentation of fact made innocently or inadvertently cannot form the basis of a conviction. Moreover, a false pretense by which

## The defendant concedes that this claim was not preserved at trial and asks that we reverse his conviction

the property is obtained must relate to a past or existing fact or set of circumstances. A false pretense as to future acts or events will not support a conviction under the statute. A mere promise to do an act in the future is not a false pretense under the statute unless at the same time the person also makes material false representations as to existing or past facts.

"A false pretense may be made by implication as well as by words written or spoken. Under some circumstances, silence may constitute false pretenses. For instance, silence and acquiescing in another's statements knowing that those statements are false may constitute a false pretense if that silence implies an affirmation of such statements and if that affirmation is engaged in with the intent to defraud another and thus obtain property of another. The mere expression of an opinion does not make the person expressing it guilty under the statute, but if one knows an opinion to be wrong, the matter is, as to him, not an opinion but an existing fact. . . .

"The second element is that, in making the representation, the defendant knew of its falsity. That is, that the defendant knew the statement was false at the time that he made it and that he made it with the intent to defraud.

"The third element is that the defendant intended to defraud the particular store—the first count would be Coach, and the second count would be Lowe's. This requires that I instruct you on the meaning of intent and how it may be proven.

"Intent relates to the condition of mind of the person who commits the act, his purpose in doing it. As defined by our statute, a person acts intentionally with respect to a result of the conduct when his conscious objective is to cause such result or to engage in such conduct.

"*What a person's intention has been is very largely a matter of inference. No witness can be expected to come here and testify that he looked into another person's mind and saw therein contained a certain intention. A jury can determine what a person's intention was at any given time by determining what that person's conduct was and what the circumstances were surrounding that conduct and from those things infer what his intention was. An intent may be inferred from circumstantial evidence, provided such inference is reasonable and isn't warranted by facts that you find proven.*

"*Intent to defraud may be difficult to prove beyond a reasonable doubt by direct evidence, but it may be inferred from the defendant's conduct. You may, if you find it reasonable and logical, infer the [necessary] intent to defraud from the circumstances and from what was done by the accused.*

"The fourth element is that the particular store was, in fact, induced by the defendant's intentionally false representation to act to their injury. This means that it must be proven that the particular store—in the first count it would be Coach or in the second count it would be Lowe's—believed the false statement and relied on it and acted on that reliance by giving the defendant the goods or merchandise.

"The fifth element is that the false representation or statement was the effective cause of the defendant receiving something of value without com-

pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[12] "[A]n improper instruction on an element of an offense . . . is of constitutional dimension." (Internal quotation marks omitted.) *State* v. *DeJesus*, 260 Conn. 466, 472–73, 797 A.2d 1101 (2002). Although the record is adequate for our review, the claim is of constitutional magnitude and the constitutional violation clearly exists, the defendant cannot prevail because the state has demonstrated that the error was harmless beyond a reasonable doubt. Moreover, at trial, the defendant virtually conceded that there was one scheme or course of conduct.

We begin our analysis by setting forth the applicable standard of review. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirely, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine

pensation. The defendant must have obtained property of value exceeding $10,000. The word obtain here includes bring about the transfer of property [to] the defendant. The word property includes money, and the value of cash is its face value." (Emphasis added.)

[12] *State* v. *Golding*, supra, 213 Conn. 239–40, provides that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.)

whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury. . . .

"[I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . . [A] jury instruction that improperly omits an essential element from the charge constitutes harmless error if a reviewing court concludes beyond a reasonable doubt that the omitted element was *uncontested and supported by overwhelming evidence*, such that the jury verdict would have been the same absent the error . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Gainey*, 116 Conn. App. 710, 715–16, 977 A.2d 257 (2009).

In his closing argument, the prosecutor argued that the evidence proved beyond a reasonable doubt that the defendant had devised a plan or scheme to defraud Coach and Lowe's. "[W]hen the defendant got arrested, there was another guy in the car, Francis Beethoven. What does the defendant say? He's got nothing to do with this. Well, the defendant wasn't the scam artist? The defendant wasn't the guy setting this all up? How would he know there was something to be involved with? If he just happened to be in the wrong place at the wrong time, why would he tell the police that Francis Beethoven had nothing to do with this? He wouldn't. He told the police that because [the defendant] at that point, knew that he was caught.

"Now, the defendant wanting a receipt, you know, the defendant did a lot to cover his tracks, didn't he? He bought warranties on stuff, he bought small innocuous items; he used a third party to make the deliveries. He never had anything delivered to his own residence. He

had it delivered to a parking lot in Bridgeport or to Tamika Creer's address. Everything the defendant did was to cover his tracks and avoid detection."

Most important is the defendant's theory of defense. The defendant did not claim that each of the serial thefts from Coach and from Lowe's were not part of one scheme or course of conduct. See *State* v. *Gainey*, supra, 116 Conn. App. 716 ("the omitted element was *uncontested and supported by overwhelming evidence*" [emphasis in original; internal quotation marks omitted]). The defendant argued that he was not the schemer. During defense counsel's opening statement, counsel stated in part: "Nobody likes to get taken advantage of. Nobody likes a scam artist. The values we have in our society [are] that you shouldn't take what doesn't belong to you. And in this case, you're going to hear evidence and you're going to hear that *a fraud occurred*, that *a fraud did take place*, that people were taken advantage of. I expect that you're going to hear that testimony. The issue is, however, the state has the burden of proving not just that a fraud occurred but that [the defendant] was responsible for it. And I submit to you that after all the evidence comes in, the state isn't going to be able to carry its burden, that the evidence is not going to show that [the defendant] is responsible *for this fraud*." (Emphasis added.)

Affirming the power of the evidence presented to the jury in this case is defense counsel's closing argument in which she conceded that there was a carefully designed plan or scheme to defraud Coach and Lowe's. Defense counsel argued in part: "The evidence shows in this case, in this case, somebody took great measures to avoid [detection]. Somebody else picked things up. Someone placed orders over phones that couldn't be traced using different names. It was so carefully planned; how clever is this; whoever is making the orders at Lowe's orders high ticket items and then items

that are $1.98. And not even that, they order a long-term plan, a warranty, some of the items. Why do they do it? I submit to you to avoid [detection]."

The concurring and dissenting opinion would reverse the defendant's conviction on the basis of *State* v. *Desimone*, 241 Conn. 439, 452–58, 696 A.2d 1235 (1997), concluding that there was not one scheme or course of conduct. The case before us, however, is factually and legally distinguishable. To begin with, the methods of the larcenies are different. The defendant in *Desimone* was charged with larceny in the first degree by means of receiving stolen property. See General Statutes §§ 53a-122 and 53a-119 (8).[13]

In *Desimone*, our Supreme Court held that "in determining the degree of the crime of larceny by receiving stolen property, the value of multiple items of allegedly stolen property may be aggregated only if the state has established that the defendant received the property pursuant to one scheme or course of conduct." *State* v. *Desimone*, supra, 241 Conn. 441. In that case, "[b]etween January, 1993, and January, 1994, several items of property were reported missing from [Pfizer, Inc.], where the defendant was employed as a maintenance mechanic. These items included three Compaq laptop computers, one Dell desktop computer system, one Toro snowblower, three power tools and one utility cart. . . . [E]ach of these items had been in the defendant's possession after Pfizer had reported the loss of the property." Id., 443. The specific time that the stolen goods came into the defendant's possession was unknown. Pfizer, Inc., received delivery of the Compaq LTE laptop computers in December, 1993, or early 1994,

---

[13] General Statutes § 53a-119 (8) provides in relevant part: "A person is guilty of larceny by receiving stolen property if he receives, retains, or disposes of stolen property knowing that it has been stolen or believing that it has probably been stolen, unless the property is received, retained or disposed of with purpose to restore it to the owner. . . ."

and reported them missing on approximately January 14, 1994. Id., 447 n.13.

Our Supreme Court agreed with the New York Court of Appeals that "a jury may aggregate the value of stolen property only if the successive takings be pursuant to a single intent and design and in execution of a common fraudulent scheme." (Internal quotation marks omitted.) Id., 457, quoting *People* v. *Cox*, 286 N.Y. 137, 141, 36 N.E.2d 84 (1941). Our Supreme Court concluded that the state's contention that the defendant in *Desimone* had received the two Compaq LTE computers pursuant to a common scheme was not supported by the evidence. Id., 463–64. The "defendant did not offer the second Compaq LTE computer for sale until several days after the first. Moreover, the evidence did not establish exactly when the defendant received the two computers or whether he received or possessed them at the same time." Id., 464.

Under the facts of this case, however, time cannot be the distinguishing factor as to whether there was one scheme or course of conduct by which the defendant defrauded Coach and another scheme or course of conduct to defraud Lowe's. Although neither we nor the concurring and dissenting opinion have found a precise definition of "one scheme or course of conduct," as set forth in § 53a-121 (b), cases such as *State* v. *Desimone*, supra, 241 Conn. 439; *State* v. *Brown*, 235 Conn. 502, 668 A.2d 1288 (1995); and *State* v. *Browne*, 84 Conn. App. 351, 392, 854 A.2d 13, cert. denied, 271 Conn. 931, 859 A.2d 930 (2004); imply that the theoretical linchpin is the accused's intent. Intent is a question of fact for the jury to decide. See *State* v. *Dickman*, 119 Conn. App. 581, 588, 989 A.2d 613, cert. denied, 295 Conn. 923, 991 A.2d 569 (2010).

Here, the court charged the jury as to intent and the facts that may be found on the basis of inferences drawn

from the defendant's conduct. See footnote 11 of this opinion. The theory of defense was that the defendant did not commit the crimes with which he was accused.[14] Significantly, with respect to the jury instruction, the defendant did not contest whether there was a common scheme to defraud Coach and a common scheme to defraud Lowe's. In her opening statement, defense counsel acknowledged several times that a fraud had occurred. During her final argument, defense counsel stated that "somebody took great measures to avoid [detection]. Somebody else picked things up. Someone placed orders over phones that couldn't be traced using different names. *It was so carefully planned*; how clever is this . . . ." (Emphasis added.) There was overwhelming evidence that within approximately one week's time, the defendant received more than $10,000 worth of goods both from Coach and from Lowe's according to an arrangement he made with Spalding.

"[A]n alleged defect in a jury charge which raises a constitutional question is reversible [impropriety] if it is reasonably possible that, considering the charge as a whole, the jury was misled . . . . In other words, the test for determining whether a constitutional [impropriety] is harmless . . . is whether it appears beyond a reasonable doubt that the [impropriety] complained of did not contribute to the verdict obtained." (Internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 463, 978 A.2d 1089 (2009). In this case, we conclude, beyond a reasonable doubt, that the improper jury instruction, when considered as a whole with the defense and in conjunction with the evidence, did not mislead the jury and that the verdict was not the product of the constitutional impropriety.

---

[14] There was evidence, however, that when he was apprehended, the defendant told the police that Beethoven, the man who was with him at the time, was not involved. Having volunteered this statement to the police at the time of his arrest belies the defendant's theory of defense.

Secondarily, from a public policy perspective, the theft of personal data, including misappropriation of credit card information is a serious problem in our society. Failure to recognize the defendant's actions as a scheme or course of conduct provides a road map for a savvy thief whose plan is to use, every other day, stolen credit card information to make purchases but is careful to limit the cost of each purchase to avoid the harsher penalties of a conviction of larceny in the first degree.

II

The defendant's second claim is that the court violated his constitutional right to represent himself. He also claims that the court erred when it failed to conduct an inquiry pursuant to Practice Book § 44-3.[15] We disagree.

The defendant concedes that his claim is unpreserved and seeks to reverse his conviction pursuant to *State v. Golding*, supra, 213 Conn. 239–40. We will review the defendant's claim because the record is adequate for review and the claim is of constitutional magnitude.[16] The defendant cannot prevail, however, because

---

[15] Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

[16] To the extent that the defendant has asserted a claim under the constitution of Connecticut, he has failed to provide an independent analysis of that claim. See *State v. Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992) (providing tools for independent analysis under state constitution). We therefore deem any such claim abandoned.

the constitutional violation did not clearly exist and he clearly was not deprived of a fair trial.

The following additional facts are relevant to the defendant's claim. On April 24, 2007, immediately prior to the start of evidence, the defendant represented, through counsel, that he wanted to represent himself. The court noted the defendant's prior requests to represent himself and that at those times, the defendant was not able to complete the court's canvass. In denying the defendant's latest request to represent himself, the court stated: "I've lost count at this point of how many requests the defendant has had to fire his own attorney to represent himself. I've lost count of the canvasses at this point. I do know that he has not been able to successfully get through the canvasses. He's had ample opportunity . . . to hire his own attorney, if he wanted to. He never did that, so I do find that his request to represent himself is nothing but an attempt to hinder, delay or impede the start of the trial." The defendant has not challenged the court's recitation of the procedural history.

"Both the federal constitution and our state constitution afford a criminal defendant the right to [forgo] the assistance of counsel and to choose instead to represent himself or herself at trial. . . . A defendant's right to represent himself or herself, after a clear and unequivocal request to do so, is not unlimited. . . . In *Faretta* [v. *California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)], the United States Supreme Court identified three grounds for denying a defendant her right to self-representation: (1) [the defendant] makes the request in [an] untimely fashion such that granting it would disrupt the proceedings . . . (2) the defendant engages in serious obstructionist misconduct . . . and (3) the defendant has not knowingly and intelligently waived his right to counsel. . . .

"In accordance with those limitations, our Supreme Court recently held [in *State* v. *Flanagan*, 293 Conn. 406, 433, 978 A.2d 64 (2009)], that when a defendant clearly and unequivocally has invoked his right to self-representation *after the trial has begun*, the trial court must consider: (1) the defendant's reasons for the self-representation request; (2) the quality of the defendant's counsel; and (3) the defendant's prior proclivity to substitute counsel. If, after a thorough consideration of these factors, the trial court determines, in its discretion, that the balance weighs in favor of the defendant's interest in self-representation, the court must then proceed to canvass the defendant in accordance with Practice Book § 44-3 to ensure that the defendant's choice to proceed pro se has been made in a knowing and intelligent fashion. If, on the other hand, the court determines, on the basis of those criteria, that the potential disruption of the proceedings already in progress outweighs the defendant's interest in self-representation, then the court should deny the defendant's request and need not engage in a [Practice Book] § 44-3 canvass." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Bozelko*, 119 Conn. App. 483, 501–502, 987 A.2d 1102, cert. denied, 295 Conn. 916, 990 A.2d 867 (2010).

In this case, trial had begun, as trial commences with voir dire. Id., 502 n.7. The court, therefore, was required to balance the factors established in *Flanagan* to determine whether the potential disruption of the proceedings already in progress outweighed the defendant's interest in representing himself. We conclude that the court engaged in the proper analysis. The court found that the defendant failed to express a clear reason for his request. The court found that the defendant's real reason for making the request to represent himself merely was an attempt to hinder, to delay or to impede the progress of trial. Although the court did not address

the second factor explicitly, the court noted that a number of attorneys had represented the defendant and that he never had suggested that any one of them was not competent. Defense counsel stated, at the time she voiced the defendant's request, that she thoroughly was prepared, had prepared cross-examinations and researched the rules of evidence. The court made no finding that counsel was not qualified, and the defendant did not ask the court to make such a finding. In light of those aggregate considerations, the second factor is met. The court directly addressed the third factor and found that the defendant had substituted counsel on numerous occasions. In denying the defendant's request to represent himself, the court noted that it had lost count of the number of requests the defendant had made to discharge his counsel and to represent himself. The court also noted that it had attempted to complete a canvass of the defendant pursuant to Practice Book § 44-3 numerous times and that the defendant had not been able at any time to get through the canvass successfully.

We conclude, therefore, on the basis of the *Flanagan* factors, that the court did not abuse its discretion in concluding that granting the defendant's request to represent himself had the potential to disrupt the proceedings, which outweighed the defendant's interest in self-representation. Consequently, there was no need for the court to conduct a canvass of the defendant pursuant to Practice Book § 44-3. Because the defendant has not demonstrated that a constitutional violation clearly exists, his claim fails under the third prong of *Golding*.

### III

The defendant's third claim is that the court abused its discretion by denying his motion for a mistrial because the prosecutor had engaged in impropriety by

intentionally charging the defendant with crimes that had been nolled in another prosecution. We disagree.

More specifically, the defendant claims that he was entitled to a mistrial because certain charges of identity theft in the third degree involved the use of credit card accounts belonging to Christopher Miller[17] and to Seath[18] to make purchases at the Lowe's store in Newington. The charges to Miller's and Seath's accounts actually were made for purchases at the Lowe's store in South Windsor. The charges against the defendant for allegedly fraudulent purchases made at Lowe's in South Windsor were nolled.

"The standard for review of an action upon a motion for a mistrial is well established. While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial [court] is the arbiter of the many circumstances which may arise during the trial in which [its] function is to assure a fair and just outcome. . . . In [our] review of the denial of a motion for mistrial, [we recognize] the broad discretion that is vested in the trial court to decide whether an occurrence at trial so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or

---

[17] The identity theft charges as to Miller in this prosecution were not presented to the jury.

[18] The jury returned a verdict of not guilty on the count of identity theft as to Seath, as it did on all counts charging identity theft.

has decided it based on improper or irrelevant factors. . . . Therefore, [i]n those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Internal quotation marks omitted.) *State* v. *Peloso*, 109 Conn. App. 477, 497–98, 952 A.2d 825 (2008).

"[W]hen confronted with a claim of prosecutorial [impropriety], we must determine whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . The burden of proving a constitutional violation as a result of prosecutorial [impropriety] rests with the defendant . . . and the defendant must demonstrate substantial prejudice." (Citations omitted; internal quotation marks omitted.) *State* v. *James G.*, 268 Conn. 382, 419, 844 A.2d 810 (2004). "[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 428, 902 A.2d 636 (2006).

It is not clear from the record whether the identity theft charges involving the credit card accounts of Miller and Seath arose from purchases made at Lowe's in South Windsor, as the defendant contends. A prior long form information charged the defendant with, among other things, identity theft as to Miller and Seath for use of their credit card accounts at Lowe's in Newington. Seath's credit card statement, which was admitted into evidence, shows that at least one transaction was made at Lowe's in Newington. Miller did not testify at trial, and the state nolled the identity theft charge as to him. The prosecutor stated on the record that he "was under the impression that [Miller] was one of the Newington victims . . . ." Although the prosecutor

may have been mistaken, the court acted well within its discretion when it found implicitly that no intentional misconduct had occurred. Moreover, there is no evidence of prejudice to the defendant, as the state withdrew the identity theft charge as to Miller before the defendant filed his motion for a mistrial and before the jury returned its not guilty verdict as to all counts of identity theft. The defendant, therefore, has failed to demonstrate that the court abused its discretion by denying his motion for a mistrial.

The judgment is affirmed.

In this opinion LAVINE, J., concurred.

BEACH, J., concurring in part and dissenting in part. I agree with the analysis and conclusion reached by the majority in parts II and III and, accordingly, would affirm the judgment with respect to the conviction of the defendant, Brushaun Thompson, of failure to appear in the first degree in violation of General Statutes § 53a-172 (a) (1). I respectfully disagree, however, with the majority's analysis and conclusion in part I of its opinion and would reverse the judgment as to the defendant's conviction of two counts of larceny in the first degree by false pretenses in violation of General Statutes §§ 53a-122 (a) (2) and 53a-119 (2), and would remand the case for a new trial as to those counts only.

With respect to part I of the majority opinion, I agree that the failure of the trial court to instruct the jury on the issue of aggregation was reviewable pursuant to State v. Golding, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). I also agree that the defendant has satisfied the third prong of Golding in that there was clear constitutional error. Unlike the majority, I do not believe that the state has demonstrated that the error was harmless beyond a reasonable doubt.

The jury was never instructed to consider whether the amounts stolen in the individual transactions were to be aggregated pursuant to General Statutes § 53a-121 (b), which states that "[a]mounts included in thefts committed pursuant to one scheme or course of conduct, whether from the same person or several persons, may be aggregated in determining the grade of the offense." Thus, the jury was never instructed on an essential element of the alleged crime, which, in the circumstances presented, is whether the individual transactions were committed "pursuant to one scheme or course of conduct . . . ." General Statutes § 53a-121 (b). Because the jury never considered, so far as we know, whether the transactions were committed pursuant to one scheme or course of conduct, the instructional error can be harmless only if we "[conclude] beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error . . . ." (Internal quotation marks omitted.) *State* v. *Gainey*, 116 Conn. App. 710, 716, 977 A.2d 257 (2009).

The majority points out that the existence of one scheme or common plan was not a hotly contested issue at trial, and I agree.[1] The defendant claimed he was not the perpetrator and did not claim, perhaps wisely, that he really committed a series of discrete thefts. In the circumstances of this case, however, I do not believe that the existence of one scheme or common plan is supported by such overwhelming evidence that the jury verdict necessarily would have been the same had the mandated instruction been given.

[1] There does not appear to have been a formal concession that there was a common scheme; rather, the issue does not seem to have been addressed specifically. The majority aptly summarizes the positions of the parties at trial. Though the majority's arguments fully support the notion that the element was not contested, they do not amount to a waiver or formal concession.

When arguing in its brief that the error was harmless, the state noted the following. The credit card numbers used, for the most part, were taken from customers of Advantage Waste Services. Arena Johnson, an employee of Advantage Waste Services who had access to customers' credit card information, admitted knowing the defendant for fifteen years. All items were purchased using a telephone. When purchasing items from the Coach store in Westport, the defendant identified himself three times as Larry Rosenblatt. The merchandise from Coach and the Lowe's store in Newington was picked up and delivered by John Spalding, the owner of ABC Moving, who delivered the items to the defendant at a supermarket parking lot in Bridgeport or at a garage in Bridgeport underneath the defendant's apartment. The defendant paid Spalding $100 for the Coach deliveries and $400 for the Lowe's deliveries. Spalding identified the defendant as the person who took and paid for the delivery of the merchandise from Coach and Lowe's. The state further argued that the evidence established that the defendant was the mastermind behind the plan.

An analysis of case law suggests that the evidence in this case does not so overwhelmingly support the existence of one scheme or course of conduct that a failure to instruct on that issue is harmless. Our Supreme Court's leading case in this area of the law is *State* v. *Desimone*, 241 Conn. 439, 696 A.2d 1235 (1997). In that case, the defendant, a maintenance mechanic, was employed by Pfizer, Inc. Id., 443. He offered for sale several computers that had been taken from Pfizer, Inc. Id. The defendant was charged with larceny by receiving various items of stolen property in the first and third degrees. Id., 449. The value of the items was aggregated for the purpose of charging him with the particular degree of that offense. The trial court, overruling an objection by the defendant as to its jury

instructions, concluded that § 53a-121 (b) was not applicable to the offense of larceny by receiving stolen property. Id., 450. Thus, the court did not instruct the jury in accordance with that statutory subsection that it may aggregate the value of the allegedly stolen property only if the state has established that the defendant received the property pursuant to one scheme or course of conduct, and the defendant challenged this omission on appeal. Id., 449–50. The Supreme Court disagreed with the state's contention on appeal that the items *necessarily* were received pursuant to one scheme or course of conduct. Id., 463–64. The Supreme Court noted that the evidence revealed that several days interceded between the times that the defendant offered the computers for sale. Id., 464. It continued: "Moreover, the evidence did not establish exactly when the defendant received the two computers or whether he received or possessed them at the same time. Thus, we cannot say that the evidence *necessarily compelled* the conclusion that the defendant's unlawful receipt of the two computers was part of a single scheme or course of conduct."[2] (Emphasis in original.) Id.

In contrast, in *State* v. *Browne*, 84 Conn. App. 351, 367, 854 A.2d 13, cert. denied, 271 Conn. 931, 859 A.2d 930 (2004), this court held that the trial court's failure to instruct the jury that it could aggregate the value of the items of stolen property only if it first concluded that the offenses were committed pursuant to one scheme or course of conduct did not require reversal. Id., 389–94. In that case, the defendant was not charged with committing a series of thefts, but, rather, he simultaneously stole and simultaneously attempted to steal two distinct

---

[2] The majority suggests that I would rely on *State* v. *Desimone*, supra, 241 Conn. 439, for the "conclu[sion] that there was not one scheme or course of conduct." Neither the *Desimone* court nor I reach such a conclusion. To the contrary, there was sufficient evidence on which a properly instructed jury could have concluded that the transactions were undertaken pursuant to one scheme or course of conduct.

sets of personalty belonging to the same family. Id., 393–94. Each aggregated charge alleged that the crime was committed at a discrete time and place.[3] Id., 394.

In this case, for the jury to find the defendant guilty of larceny in the first degree, it had to aggregate transactions that occurred at different times. There is no doubt that the values of the goods ordered in each telephone transaction should be aggregated, and the defendant does not assert otherwise. Additionally, the evidence of one scheme or course of conduct may well have been sufficient to support the aggregation of the value of goods ordered in different telephone calls and received in different transactions had the court properly instructed the jury regarding aggregation. The transactions, however, occurred on different days and were accomplished by different calls and different deliveries. Although there was evidence that Spalding was to be generally available and the methods of the crimes were quite similar, a jury reasonably could have failed to reach the conclusion that the transactions were but steps effecting a single scheme, had it been so instructed. For example, the jury may not have believed the entirety of Spalding's testimony; similarly, a reasonable doubt could have arisen from a hypothesis that the defendant's intent to commit a subsequent transaction was not fully formed until just prior to its commission. There may have been other hypotheses consistent with the evidence. Consistent with *State* v. *Desimone*, supra, 241 Conn. 439, the transactions were not *necessarily* part of one scheme or course of conduct.[4] I therefore agree with the defendant that the state did not

[3] In *State* v. *Brown*, 235 Conn. 502, 514–19, 668 A.2d 1288 (1995), the Supreme Court held that the values of checks attempted to be cashed within moments of each other could be aggregated under § 53a-121 (b) The court did not decide whether the values necessarily had to be aggregated. Id.

[4] I have found no precise definition of the phrase "one scheme or course of conduct." Cases such as *State* v. *Desimone*, supra, 241 Conn. 439; *State* v. *Brown*, 235 Conn. 502, 668 A.2d 1288 (1995); and *State* v. *Browne*, supra, 84 Conn. App. 351; suggest by example that the theoretical linchpin is intent:

prove that the court's failure to instruct the jury in accordance with § 53a-121 (b) was harmless beyond a reasonable doubt. Accordingly, I believe that the defendant's claim satisfies the fourth prong of *Golding* because the state has failed to demonstrate the harmlessness of the alleged constitutional violation beyond a reasonable doubt, and the error may have resulted in the defendant's convictions of larceny in the first degree.

For the foregoing reasons, I respectfully concur in part and dissent in part.[5]

---

if the accused intentionally sets out to engage in a more or less continuous course of conduct that contemplates a series of thefts, then the value of goods taken in the thefts may be aggregated for the purposes of determining the degree of the larceny. If, on the other hand, the accused decides to commit one larceny and later decides to commit another, the values of the goods taken may not be aggregated even if the methods of committing the crimes are very similar. In extreme situations, the failure to instruct the jury pursuant to § 53a-121 (b) may be harmless, but ordinarily the determination of intent is a factual question for the finder of fact. See generally 3 C. Torcia, Wharton's Criminal Law (15th Ed. 1995) §§ 345 and 346, pp. 361–69.

The scenario is further complicated by the axiom that a jury may believe some, all or none of any witness' testimony. Some of Spalding's testimony, for example, regarding the defendant's statements to him, may have been self-serving and to some degree disbelieved by the jury. As a reviewing court, we should not be left to speculate.

[5] The majority suggests that a thief could take advantage of the reasoning of the concurring and dissenting opinion and avoid harsh punishment by serializing crimes. I would suggest that even such a well-read and erudite felon runs a great risk of being convicted of the greater degree of larceny by a properly instructed jury. The issue is not whether the evidence presented in this case is sufficient to convict.